147 A.3d 536

ROBINSON TOWNSHIP, Washington County, Pennsylvania, Brian Coppola, Individually and in His Official Capacity as Supervisor of Robinson Township, Township of Nockamixon, Bucks County, Pennsylvania, Township of South Fayette, Allegheny County, Pennsylvania, Peters Township, Washington County, Pennsylvania, David M. Ball, Individually and in His Official Capacity as Councilman of Peters Township, Township of Cecil, Washington County, Pennsylvania, Mount Pleasant Township, Washington County, Pennsylvania, Borough of Yardley, Bucks County, Pennsylvania, Delaware Riverkeeper Network, Maya Van Rossum, The Delaware Riverkeeper, Mehernosh Khan, M.D.

v.

COMMONWEALTH of Pennsylvania, Pennsylvania Public Utility Commission, Gladys M. Brown, in Her Official Capacity as Chairman of the Public Utility Commission, Office of the Attorney General of Pennsylvania, Kathleen Kane, in Her Official Capacity as Attorney General of the Commonwealth of Pennsylvania, Pennsylvania Department of Environmental Protection and John H. Quigley, in His Official Capacity as Secretary of the Department of Environmental Protection

Appeal of: Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission, Robert F. Powelson, in His Official Capacity as Chairman of the Public Utility Commission

Robinson Township, Washington County, Pennsylvania, Brian Coppola, Individually and in His Official Capacity as Supervisor of Robinson Township, Township of Nockamixon, Bucks County, Pennsylvania, Township of South Fayette, Allegheny County, Pennsylvania, Peters Township, Washington County, Pennsylvania, David M. Ball, Individually and in His Official

Capacity as Councilman of Peters Township, Township of Cecil, Washington County, Pennsylvania, Mount Pleasant Township, Washington County, Pennsylvania, Borough of Yardley, Bucks County, Pennsylvania, Delaware Riverkeeper Network, Maya Van Rossum, The Delaware Riverkeeper, Mehernosh Khan, M.D.

v.

Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission, Gladys M. Brown, in Her Official Capacity as Chairman of the Public Utility Commission, Office of the Attorney General of Pennsylvania, Kathleen Kane, in Her Official Capacity as Attorney General of the Commonwealth of Pennsylvania, Pennsylvania Department of Environmental Protection and John H. Quigley, in His Official Capacity as Secretary of the Department of Environmental Protection

Cross Appeal of: Washington County, Pennsylvania, Brian Coppola, Individually and in His Official Capacity as Supervisor of Robinson Township, Township of Nockamixon, Bucks County, Pennsylvania, Township of South Fayette, Allegheny County, Pennsylvania, Peters Township, Washington County, Pennsylvania, David M. Ball, Individually and in His Official Capacity as Councilman of Peters Township, Township of Cecil, Washington County, Pennsylvania, Mount Pleasant Township, Washington County, Pennsylvania, Borough of Yardley, Bucks County, Pennsylvania, Delaware Riverkeeper Network, Maya Van Rossum, The Delaware Riverkeeper, Mehernosh Khan, M.D.

No. 104 MAP 2014<br/>No. 105 MAP 2014

Supreme Court of Pennsylvania.

ARGUED: March 9, 2016<br/>DECIDED: September 28, 2016

242

Walter A. Bunt Jr., Esq., Craig Prescott Wilson, Esq., K&L Gates LLP, for Gas Assco, the Marcellus Shale Coalition, American Petroleum Institute, Amicus Curiae.

Robert L. Byer, Esq., Meredith Ellen Carpenter, Esq., Andrew Ronald Sperl, Esq., Duane Morris LLP, Robert McCarthy Palumbos, Esq., for Chambers of Commerce of US, PA Chamber of Business and Ind., Susq. Industrial Dev. Corp. Warren Co., Amicus Curiae.

Scott E. Coburn, Esq., for Pennsylvania State Association of Township Supervisors, Amicus Curiae.

Emily Ann Collins, Esq., for Clean Air Council, Clean Water Action, Natural Resources Defense Council, & Sierra Club, Amicus Curiae.

John J. Zimmerman, Esq., for Damascus Citizens for Sustainability Inc., Amicus Curiae.

Matthew Hermann Haverstick, Esq., Mark Edward Seiberling, Esq., Joshua John Voss, Esq., for Pennsylvania Public Utility Commission, Appellant.

John J. Arminas, Esq., Jonathan Mark Kamin, Esq., Goldberg, Kamin & Garvin, Jennifer Lynn Fahnestock, Esq., William A. Johnson, Esq., Susan Jill Kraham, Esq., Thomas P. McDermott, Esq., Gaitens, Tucceri & Nicholas, P.C., John Michael Smith, Esq., Smith Butz, L.L.C., Lauren M. Williams, Esq., Jordan Berson Yeager, Esq., Curtin & Heefner, L.L.P., for Twp. of Nockamixon; Twp. of S. Fayette; Peters Twp.; Twp. of Cecil; Mt. Pleasant Twp.; et al, Appellees.

Alexandra C. Chiaruttini, Esq., Sean Martin Concannon, Esq., Office of General Counsel, Elizabeth A. Davis, Esq., Pennsylvania Department of Environmental Protection, Gregory R. Neuhauser, Esq., PA Office of Attorney General, for Pennsylvania Department of Environmental Protection, Appellee.

Howard Greeley Hopkirk, Esq., Gregory R. Neuhauser, Esq., Pennsylvania Office of Attorney General, for Commonwealth of PA, Attorney General's Office, Appellee.

SAYLOR, C.J., EAKIN, BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.

**OPINION**

JUSTICE TODD

This is a consolidated appeal from the decision of the Commonwealth Court following our remand to that tribunal to resolve open issues pursuant to our Court's mandate in Robinson Township v. Commonwealth of Pennsylvania, 623 Pa. 564, 83 A.3d 901 (2013) ("Robinson II"). In that case, our Court struck the entirety of Sections 3215(b), 3215(d), 3303, and 3304 of Act 13 of Feb. 14, 2012, P.L. 87 ("Act 13"),[1] as violative of the Pennsylvania Constitution, and we enjoined the application and enforcement of Section 3215(c) and (e) and Sections 3305 through 3309, to the extent that they implemented or enforced the provisions of Act 13 which our Court invalidated. For the reasons that follow, we affirm the portion of the order the Commonwealth Court issued on remand, Robinson Township v. Commonwealth of Pennsylvania, 96 A.3d 1104 (Pa.Cmwlth. 2014) ("Robinson III"), holding that Sections 3305 through 3309 were not severable from Sections 3303 and 3304, and we also uphold its conclusion that the passage of Act 13 did not violate Article III, Section 3 of the Pennsylvania Constitution—the "single subject rule." However, because we conclude that Sections 3218.1, 3222.1(b)(10) and 3222.1(b)(11) contravene Article III, Section 32 of the Pennsylvania Constitution, due to our determination that they constitute special legislation which is forbidden by that constitutional provision, we reverse the Commonwealth Court's order upholding these sections, and enjoin their further application and enforcement. In that regard, we stay our mandate with respect to Section 3218.1 for 180 days in order to give the General Assembly sufficient time to enact remedial legislation. Further, because we determine that Section 3241 is unconstitutional on its face, as it grants a corporation the power of eminent domain to take

1. Parts of Act 13, which is codified at 58 Pa.C.S. §§ 2301–3504, became effective on Feb. 14, 2012, with the remaining provisions taking effect on April 16, 2012.

private property for a private purpose, in violation of the Fifth Amendment of the United States Constitution and Article I, Sections 1 and 10 of the Pennsylvania Constitution, we reverse the Commonwealth Court's order and direct this provision be stricken as well, and enjoined from further application and enforcement.

## I. Background

In February 2012, the Pennsylvania General Assembly passed Act 13—a sweeping law regulating the oil and gas industry—which, *inter alia*, repealed parts of the existing Oil and Gas Act of 1984 [2] codified in Title 58 of the Pennsylvania Consolidated Statutes and created six new chapters therein, the specific provisions of two of which—Chapters 32 and 33— are at issue in this appeal. The questions raised in the instant appeal involve Sections 3218.1, 3222.1, and 3241 of Chapter 32, and Sections 3305 through 3309 of Chapter 33, the operation of which we describe briefly at the outset of this opinion so that the reader may understand the extensive prior jurisprudence from our Court and the Commonwealth Court concerning the function and interplay of these statutory provisions.[3]

Chapter 32 of Title 58, entitled "Development," delineates various permitting, operational, notification, and disclosure requirements for companies, individuals, and governmental entities concerning the drilling and operation of wells for gas, petroleum, and related liquids. It also provides for the implementation of certain subsurface storage methods for natural

2. Act No. 223 of 1984, P.L. 1140 (effective April 18, 1985), hereinafter "1984 Act".

3. Although not directly at issue in this appeal, but nevertheless an integral part of the overall regulatory regimen established by Act 13, Section 3215 of Chapter 33 imposed minimum setback requirements for conventional and unconventional wells from buildings, water wells, wetlands, streams, springs, and other bodies of water for all well permits issued by the Department of Environmental Protection ("DEP"), from which the DEP was required to grant variances under certain conditions. Also, Section 3215 did not require the DEP to consider the input of local municipalities in this permitting process. After our Court's decision in Robinson II, only Section 3215(a), which prescribes setback distances for oil and gas wells from buildings and water wells, remains in effect.

gas within our Commonwealth. As explained more fully herein, Section 3218.1 establishes a requirement that the DEP, upon being informed of a "spill," and, after investigation, "notify any public drinking water facility that could be affected by the event that the event occurred." 58 Pa.C.S. § 3218.1.

Section 3222.1 applies to hydraulic fracturing activities, i.e., "fracking," carried out in the drilling and operation of "unconventional wells" to extract natural gas.[4] It requires a service provider, vendor, or operator of such a well to disclose chemicals used in the operation of the well within 60 days of the conclusion of fracking activities to a "chemical disclosure registry," which is an internet website jointly operated by a group of state water quality officials and representatives of oil and gas producing states.[5] 58 Pa.C.S. §§ 3203, 3222.1(b)(2). However, Section 3222.1 specifically exempts from such disclosure the "identity of a chemical or the concentration of a chemical, or both" which a "service provider who performs any part of a hydraulic fracturing treatment," "a vendor who provides hydraulic fracturing additives directly to [a well] operator for a hydraulic fracturing treatment," or a well "operator," has claimed to be "a trade secret or confidential proprietary information." 58 Pa.C.S. § 3222.1(b), (1), (3). In such circumstances, the service provider, vendor, or well operator is only required to submit a signed written statement to the registry that the record contains a trade secret or confidential proprietary information, and must include in the disclosure form "the chemical family or similar description associated with the chemical." Id. § 3222.1(b)(3). Section 3222.1(b)(5) also provides that any information which is protected as a trade secret or as confidential proprietary information which

4. See 58 Pa.C.S. § 3203 (defining "unconventional well" as "[a] bore hole drilled or being drilled for the purpose of or to be used for the production of natural gas from an unconventional formation."); Robinson II, 83 A.3d at 914–15 (describing fracking as the "pumping at high pressure into the rock formation a mixture of sand and freshwater treated with a gel friction reducer, until the rock cracks, resulting in greater gas mobility.").

5. This website can be found at www.fracfocus.org.

has been submitted to the DEP is not a public record. 58 Pa.C.S. § 3222.1(b)(5).

Additionally, Section 3222.1 limits the disclosure by a service provider, vendor, or well operator to any "health professional"[6] of the identity and amounts of chemicals claimed to be trade secrets or confidential proprietary information. It requires that, in order for health care professionals to obtain this information from such persons or entities as part of the routine treatment of a patient, they must execute a confidentiality agreement as well as provide a written statement attesting that: "[t]he information is needed for the purpose of diagnosis or treatment of an individual;" "[t]he individual being diagnosed or treated may have been exposed to a hazardous chemical;" or "[k]nowledge of [such] information will assist in the diagnosis or treatment of an individual." Id. § 3222.1(b)(10)(i–iii). Section 3222.1(b)(11) affords health professionals a limited opportunity to orally request such information in the event the professional determines that "a medical emergency exists," and that the information is "necessary for emergency treatment"; however, in order to obtain the information in those circumstances, the health professional is required to verbally acknowledge "that the information may not be used for purposes other than the health needs asserted" and that the health professional will keep the information confidential. Id. § 3222.1(b)(11). Even after the health professional makes such a verbal request and acknowledgment, the service provider, vendor, or well operator may still require that the health professional execute a written statement of need and a confidentiality agreement "as soon as circumstances permit, in conformance with regulations promulgated under this chapter." Id.

Section 3241 allows "a corporation empowered to transport, sell or store natural gas or manufactured gas in this Commonwealth" the right to "appropriate an interest in real property

6. Act 13 defines a "[h]ealth professional" as "[a] physician, physician assistant, nurse practitioner, registered nurse or emergency medical technician licensed by the Commonwealth." 58 Pa.C.S. § 3203.

located in a storage reservoir[7] or reservoir protective area[8] for injection, storage and removal from storage of natural gas or manufactured gas in a stratum which is or previously has been commercially productive of natural gas." Id. § 3241(a).

Chapter 33, which is entitled "Local Ordinances Relating to Oil and Gas Operations," severely curtailed the ability of local municipalities to regulate the oil and gas industry. Section 3302 of this chapter "preempts and supersedes the regulation of oil and gas operations" as provided in the remainder of the chapter, and it prohibits municipalities from enacting any "local ordinance,"[9] via the Municipalities Planning Code (the "MPC"),[10] or the Flood Plain Management Act,[11] containing "provisions which impose conditions, requirements or limitations on the same features of oil and gas operations regulated by Chapter 32 or that accomplish the same purposes as set forth in Chapter 32." Id. § 3302. Section 3303 prohibits local governments from enacting or enforcing environmental legislation regulating oil and gas operations by explicitly providing that "environmental acts ... to the extent that they regulate oil and gas operations, occupy the entire field of regulation, to the exclusion of all local ordinances." Id. § 3303. Section 3304 requires that all municipal ordinances regulating oil and gas operations be uniform, and mandated that certain drilling and ancillary activities attendant to the production of natural gas be allowed in every zoning district in a local political subdivi-

7. A "[s]torage reservoir" is defined as "[t]hat portion of a subsurface geological stratum into which gas is or may be injected for storage purposes or to test suitability of the stratum for storage." 58 Pa.C.S. § 3203.

8. A "[r]eservoir protective area" is "[t]he area surrounding a storage reservoir boundary, but within 2,000 linear feet of the storage reservoir boundary, unless an alternate area has been designated by the DEP, which is deemed reasonably necessary to afford protection to the reservoir, under a conference held in accordance with section 3251 (relating to conferences)." 58 Pa.C.S. § 3203.

9. Section 3301 defines a local ordinance as "[a]n ordinance or other enactment, including a provision of a home rule charter, adopted by a local government that regulates oil and gas operations." 58 Pa.C.S. § 3301.

10. 53 P.S., Chapter 30.

11. 32 P.S. §§ 679.101 et. seq.

sion—existing zoning laws notwithstanding. As mentioned above, and discussed at greater length infra, in Robinson II, this Court found Sections 3303 and 3304 to be unconstitutional and enjoined them from operation and effect.

Sections 3305 and 3306 of Chapter 33 provide a mechanism for the Public Utility Commission ("PUC") and the Commonwealth Court to determine whether a local ordinance violates the MPC or Chapters 32 and 33. Section 3305 allows a municipality to request the PUC review a local ordinance before it is passed and to issue a written opinion determining whether it violates the MPC or Chapters 32 and 33. Id. § 3305(a). Section 3305 also grants the owner or operator of an oil and gas operation "who is aggrieved by the enactment or enforcement of a local ordinance" to request that the PUC review the ordinance and issue an order determining whether the ordinance violates the MPC, or Chapters 32 and 33. Id. § 3305(b). Such order is subject to de novo review in the Commonwealth Court. Section 3306 allows "any person" who is similarly aggrieved by the enactment or enforcement of a local ordinance to bypass the PUC and "bring an action in Commonwealth Court to invalidate the ordinance or enjoin its enforcement." Id. § 3306.

Sections 3307 and 3308 provide penalties for municipalities if their local ordinances fail to comply with the requirements of the MPC or Chapters 32 and 33. Under Section 3307(i), a local government is liable to pay reasonable counsel fees and costs of a prevailing plaintiff in an action seeking to invalidate or enjoin an ordinance if the Commonwealth Court "determines that the local government enacted or enforced a local ordinance with willful or reckless disregard" of the MPC or Chapters 32 and 33. Id. § 3307(1). Conversely, Section 3307(2) requires a plaintiff to pay reasonable counsel fees and costs if the Commonwealth Court determines that the plaintiff's action was "frivolous or was brought without substantial justification." Id. § 3307(2).

Section 3308 provides that, in the event the PUC, the Commonwealth Court, or our Court issues an order determining that a particular ordinance violates the MPC or Chapters

32 and 33, the local government unit which enacted the ordinance becomes immediately ineligible to receive any monies from unconventional gas well fees, otherwise known as "impact fees" authorized by Chapter 23 of Act 13 and assessed for each unconventional gas well. Id. § 3308. Such ineligibility continues until the local government amends the ordinance to conform with Chapter 33, repeals the ordinance, or the order determining the ordinance is unlawful is reversed on appeal. Id. Section 3309 specifies that Chapter 33 applies to ordinances in existence at the time this portion of Act 13 took effect on April 16, 2012, and to any ordinances enacted thereafter, and it gives municipalities 120 days after the effective date of the act to conform their ordinances to the requirements of Chapter 33. Id. § 3309.

In March 2012, as set forth in the caption of this appeal, seven municipalities,[12] two individuals, in their capacity as elected local government officials and in their own right, a non-profit environmental group and its director, as well as a Pennsylvania licensed physician—a group collectively designated by our Court in Robinson II as "Citizens," a nomenclature which we retain in this appeal, filed a 14-count petition for review in the Commonwealth Court, invoking its original jurisdiction. Citizens sought a declaratory judgment that Act 13 is unconstitutional, as well as a permanent injunction against its enforcement. In response, the PUC, the Pennsylvania Attorney General and the DEP (collectively "the Commonwealth") filed preliminary objections and cross-motions for summary relief.

Relevant to the issues raised in the current appeal, in its initial decision adjudicating the parties' respective motions for summary judgment, Robinson Township v. Commonwealth of Pennsylvania, 52 A.3d 463 (Pa.Cmwlth.2012) ("Robinson I"),

---

12. Somewhat ironically, the party which is the namesake of this litigation, Robinson Township, withdrew from this matter on remand and is no longer a party to this appeal, and Brian Coppola is no longer participating in the capacity of Robinson Township supervisor, as he no longer serves in that role, although he remains in this case in his individual capacity.

an en banc panel of the Commonwealth Court[13] rejected various challenges by Citizens to Act 13. With respect to their claims that certain provisions violated Article III, Section 32 of the Pennsylvania Constitution because they were special laws which granted the oil and gas industry special treatment under local zoning laws, the court treated all of the individual challenges as a singular global challenge to the entirety of Act 13.[14] While acknowledging that Act 13 did treat the oil and gas industry differently than other extraction industries such as coal mining, it reasoned that the disparate treatment was justified by "real differences" between the fundamental nature of oil and gas drilling and that of the other extraction industries, although it did not expound on the nature of those purported differences. Id. at 487.

Further, the court found that Dr. Mehernosh Khan—the medical doctor challenging the non-disclosure provisions of Section 3222.1 on the basis that they violate the prohibition on special laws contained in Article III, Section 32—did not have standing to maintain such a challenge. The court reasoned that Dr. Khan had only alleged the possibility that Section 3222.1 would interfere with his ability to provide medical care to his patients. In the court's view, Dr. Khan was required to formally request the identity of fracking fluids and chemicals, and then show that the restrictions on the disclosure of such information actually interfered with his ability to treat his patients and diagnose disease in order to obtain judicial review of this claim.

13. The reported opinion of the Commonwealth Court indicates this panel was composed of then-President Judge Pellegrini, and Judges McGinley, Leadbetter, Simpson, Brobson, McCullough and Covey; however, under the Commonwealth Court's internal operating procedures, all draft opinions are circulated to all of the commissioned judges of the court for a vote. Because of the recusal of Judge Leavitt from voting under this process, the vote of the remaining commissioned judges was evenly divided; thus, the Commonwealth Court's internal operating procedures required the opinion to be filed "as circulated." See Commonwealth Court Internal Operating Procedures § 256(b); Robinson I, 52 A.3d at 468 n. 1.

14. See infra at Part II.B.1.

The court also found that Act 13 did not violate Article I, Section 27 of the Pennsylvania Constitution (the "Environmental Rights Amendment").[15] The court reasoned that, because Section 3303 preempted local municipalities from addressing environmental matters through zoning ordinances, the municipalities were now "relieved of their responsibilities to strike a balance between oil and gas development and environmental concerns under the MPC"; hence, Citizens could not state a claim for violation of Article I, § 27, inasmuch as the municipalities no longer had a duty to consider environmental concerns when administering their zoning ordinances. Id. at 489.

The court additionally rejected Citizens' claim that Section 3241 was unconstitutional under the Pennsylvania and United States Constitutions because it allowed a private person to take another person's property for the creation of subsurface storage reservoirs for storing natural gas and taking abutting areas around those reservoirs as a buffer zone for the stored natural gas. The court agreed with the Commonwealth's assertion that Citizens had not demonstrated that any person's property was taken under this statutory provision, or was in imminent danger of being taken. The court further determined that, even if such a claim were presented, it lacked jurisdiction to adjudicate the claim as, in its view, the sole method to challenge the power of a condemnor to appropriate property was for the condemnee to file preliminary objections once a condemnor files a formal declaration of taking. Id. at 488.

The court, however, credited the argument of Citizens that Section 3304 violated the substantive due process protections of the Pennsylvania and United States' Constitutions "because it allows incompatible uses in zoning districts and does not protect the interests of neighboring property owners from

15. Article I, Section 27 is contained within the Declaration of Rights of the Pennsylvania Constitution and provides:

The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const., art. I, § 27.

harm, alters the character of the neighborhood, and makes irrational classifications."[16] Id. at 485. Thus, the court declared Section 3304 unconstitutional and enjoined the Commonwealth from implementing that section, as well as all other provisions of Chapter 33 that enforced that section. The court did not, however, disturb Sections 3301 to 3303. Id.

The court also held that Section 3215(b)(4), which required the DEP, upon request of the holder of oil and gas rights for a particular piece of property, to grant a waiver to a well operator of the prescribed minimum distances set forth in Section 3215(b)(1) for conventional oil and gas wells (100 feet), or unconventional gas wells (300 feet), from any "solid blue lined stream,[17] spring or body of water" that appear on a United States Geological Survey Topographical map,[18] and 300 feet between unconventional wells and wetlands,[19] was unconstitutionally vague because the General Assembly failed to provide adequate standards to constrain the DEP in its granting of such waivers. Id. at 493.

Citizens and the Commonwealth cross-appealed the Robinson I decision. In Robinson II, then-Chief Justice Castille authored a scholarly and comprehensive opinion, joined in its entirety by this author, and by then-Justice McCaffery. Justice Baer filed a concurring opinion which joined Chief Justice Castille's opinion in part; however, Justice Baer fully joined our Court's mandate to affirm in part and reverse in part Robinson I, and to remand to the Commonwealth Court for further proceedings. Chief Justice Saylor authored a dissent joined by Justice Eakin, who also authored a separate dissent.

16. Three members of the court dissented on this issue.

17. According to the United States Geologic Survey (USGS), a "solid blue lined stream" as that term is used in Section 3215(b)(1) is a perennial stream, which is depicted on a topographical map with an unbroken blue line. See http://water.usgs.gov/osw/streamstats/instructions1.html.

18. Hereinafter, all references to stream, spring or body of water are intended to refer to such entities as they are described in Section 3215(b).

19. See 58 Pa.C.S. § 3215(b)(1)-(3).

Pertinent to this appeal, the plurality opinion, *inter alia*, determined that Sections 3303 and 3304 were violative of Article I, Section 27. The plurality observed that Article I, Section 27, in addition to guaranteeing the right of all the people of the Commonwealth to clean air and pure water, correspondingly obligated "the Commonwealth" to act as trustee to conserve and maintain these and other public natural resources for the benefit of all the people in this and future generations. In requiring the Commonwealth to act in the capacity of trustee of public natural resources, the plurality determined that Article I, Section 27 "speaks on behalf of the people, to the people directly," and, therefore, granted to the people the right to directly enforce the Commonwealth's trustee obligations. Robinson II, 83 A.3d at 974. The plurality thus considered Article I, Section 27 as a restriction on the power of the General Assembly to deprive, through legislation, the people's inherent right to benefit from the Commonwealth's execution of its duty to manage public natural resources.

Applying this constitutional principle, the plurality proceeded to analyze Section 3303 and found it to contravene Article I, Section 27. While acknowledging that the general powers of municipalities to enact laws and regulations are conferred by the General Assembly, and, correspondingly, may be altered or restricted by that body, the plurality emphasized that the General Assembly did not have the authority to abrogate, via legislation, the duties and responsibilities owed by municipalities to their citizens under the Pennsylvania Constitution. In the plurality's view, because Section 3303 *entirely* superseded all existing local environmental ordinances and regulations previously enacted by municipalities governing the activities of the oil and gas industries, and expressly preempted any and all future such local regulations, it "command[ed] municipalities to ignore their obligations under Article I, Section 27" and, also, directed them "to take affirmative actions to undo existing protections of the environment in their localities." Id. at 978. Consequently, the plurality concluded that the legislature's police power, although broad, did not extend this far to allow the fundamental disruption of the reasonable expecta-

tions of the citizens of the affected municipalities to continued enjoyment of the environmental protections afforded them by their local governments through ordinance and regulation; hence, it found Section 3303 unconstitutional.

The plurality likewise found Section 3304 constitutionally infirm. The plurality noted that, when the General Assembly exercises its police powers to promote the general welfare, it is also obligated to adhere to its duties as a trustee of public natural resources under Article I, Section 27 and, therefore, must, through its legislative enactments, "adequately restrain[ ] actions of private parties likely to cause harm to protected aspects of our environment." Id. at 979. The plurality found that the legislature, in enacting Section 3304, did not fulfill this duty of trusteeship.

Furthermore, the plurality opinion affirmed the Commonwealth Court's decision that Section 3215(b)(4) was unconstitutional since it did "not provide any ascertainable standards by which public natural resources are to be protected if an oil and gas operator seeks a waiver of the Section 3215(b) setbacks." Id. at 983. The plurality then applied its Article I, Section 27 trustee rationale to also strike down Section 3215(d), which granted the DEP the discretion to consider the comments of municipalities and storage operators in deciding to grant a well permit, but, concomitantly, prohibited municipalities from appealing the DEP's decision on a well permit. The majority reasoned that this provision "marginalizes participation by residents, business owners, and their elected representatives with environmental and habitability concerns, whose interests Section 3215 ostensibly protects." Id. at 984. The plurality considered this to have the effect of "foster[ing] decisions regarding the environment and habitability that are non-responsive to local concerns; and ... the effect of failing to account for local conditions causes a disparate impact upon beneficiaries of the trust." Id.[20][21]

20. Citizens did not assert separate claims challenging the constitutionality of Sections 3215(a) and 3215(f), which established, uniformly throughout the Commonwealth, the minimum distances oil and gas wells could be located from buildings, water supplies, and floodplains.

In his concurring opinion, Justice Baer concurred in the plurality's finding that Section 3215(b)(4) was unconstitutional; however, his rationale differed in that, as described more fully infra, he would have affirmed the Commonwealth Court's decision on the basis that these statutory provisions violated substantive due process. Likewise, Justice Baer agreed in his concurrence with the plurality's conclusion that Section 3215(d) was unconstitutional, but, again, he did so based on his view that Section 3215(d) violated substantive due process.

With respect to the question of whether Sections 3303 and 3304 were severable from the remainder of Chapter 33, a majority of the Court—the plurality joined by Justice Baer[22]—concluded:

Sections 3305 through 3309 are those parts of the statutory scheme that establish a mechanism by which to enforce compliance with the Municipalities Planning Code and with Chapters 32 and 33 of Act 13, including Sections 3215, 3303 and 3304. To the extent that Sections 3305 through 3309 implement or enforce provisions we hold invalid, these provisions are incapable of execution and are enjoined.

Id. at 999.

By majority mandate, our Court remanded the matter to the Commonwealth Court "to address whether any remaining provisions of Act 13, to the extent they are valid, are severable." Id. at 1000. Justice Baer, while joining this mandate to remand, opined that he "would further enjoin the entirety of Sections 3305 through 3309 as 'incapable of execution' upon

Nevertheless, the plurality observed that these sections reflected the same structure as that in Section 3215(b) where "development and disturbance of the environment is preferred over the natural state," and, thus, viewed them as "constitutionally suspect." Robinson II, 83 A.3d at 973 n. 55.

21. The plurality expressed no opinion on the substantive due process analysis employed by the Commonwealth Court, and endorsed and applied by Justice Baer in his concurring opinion.

22. As noted by Justice Baer in his Concurring Opinion, his full joinder of the portions of the lead opinion other than the Article I, Section 27 analysis, and the holding based on that analysis, renders these other parts of the opinion a majority expression of our Court. Robinson II, 83 A.3d at 1000 n. 1 (Baer, J., concurring).

the striking of Sections 3303 and 3304." Id. at 1008 (Baer, J., concurring).

Additionally, the majority concluded that the waiver requirements of Section 3215(b)(4) were "a key part of the Section 3215(b) scheme," and that the General Assembly did not intend for the setback provisions in the remaining parts of Section 3215(b) to operate without the oil and gas industry having the ability to seek waivers. Robinson II, 83 A.3d at 999. Thus, a majority of the Court ruled that those provisions were not severable. Further, the majority deemed Sections 3215(c), which required the DEP in making a well permit decision to consider its impact on public resources such as public parks and historical landmarks, etc., and 3215(e), which mandated that the Environmental Hearing Board develop regulations governing the DEP's consideration of public resources during the permitting process, to be part of the overall decisional process established by Section 3215(b) and "incapable of execution in accordance with the legislative intent;" thus the majority enjoined them as well. Id. at 999. In his concurring opinion, Justice Baer opined that he would have, additionally, enjoined 3215(a) because he deemed it "incapable of execution," based on his view that it was "inextricably linked" to Section 3215(b)(4) which required the DEP to grant waivers to the setback requirements set forth in Section 3215(a). Id. at 1009, n. 6 (Baer J., concurring).

With respect to the Commonwealth Court's global disposition of Citizens' various individual claims that Act 13 constituted a special law under Article III, Section 32, the majority held this to be improper. We noted that, neither the fact that the oil and gas industry, as a whole, differed in character when compared to other industries, nor "the declared benign purpose of Act 13" controls the requisite constitutional analysis. Robinson II, 83 A.3d at 988. Instead, we underscored that: "the required inquiry is into the effect of the provisions challenged by [Citizens], with respect to whether the admitted different treatment of the oil and gas industry represented by Act 13 rests upon some ground of difference that is reasonable rather than arbitrary and has a fair and substantial relation-

ship to the object of each challenged provision." Id. (quoting Pennsylvania Turnpike Commission v. Commonwealth, 587 Pa. 347, 899 A.2d 1085, 1094 (2006)). Hence, on remand, we directed the Commonwealth Court to address Citizens' discrete challenges to individual portions of Act 13 as violative of Article III, Section 32 of the Pennsylvania Constitution, which included the two provisions, Section 3218.1 and Sections 3222.1(b)(10)–(11), at issue in this appeal—the different requirements for notification of public and private well operators in the event of a spill that threatens the safety of drinking water, and the prohibition on physicians from disclosing information regarding the specific fracking chemicals to which their patients have been exposed absent execution of confidentiality agreements with the entities which used such chemicals in the fracking process.

Regarding Citizens' claim that Section 3241 violated the Pennsylvania and United States Constitutions' prohibitions against taking of private property for private use, the majority concluded that the Commonwealth Court improperly dismissed the claim. The majority reasoned that the nature of this particular challenge was a facial challenge to the constitutionality of a statute, and, thus, the Declaratory Judgment Act, 42 Pa.C.S. § 7541(b), allowed Citizens to seek pre-enforcement review, and they were not required to await the filing of a formal declaration of taking as the Commonwealth Court held. Consequently, our Court reversed the Commonwealth Court's order and remanded for that tribunal to render a decision on the merits of this claim.

Similarly, a majority of the Court determined that the Commonwealth Court had improperly dismissed Dr. Khan's claim for lack of standing. We observed that our jurisprudence permitted pre-enforcement review of laws which presented an individual with "unpalatable professional choices." Robinson II, 83 A.3d at 924. We accepted Dr. Khan's argument that, because of the strict confidentiality requirements of Section 3222.1(b), not allowing review of his claim at this juncture would leave him in the difficult position of having to choose among three untenable courses of action as a medical profes-

sional: (1) violate Section 3222.1(b) by breaching a confidentiality agreement in order to share information with other health care providers so that he can treat his patients; (2) not sharing the information during treatment of his patients, and thereby contravening his legal and ethical duty to report his medical findings to his patients and other medical professionals; or (3) refusing to accept patients whenever he would be required to maintain confidentiality during the course of their treatment. Therefore, we found Dr. Khan to have a substantial, direct, and immediate interest in the resolution of his constitutional claim, and so had standing; hence, we remanded for the Commonwealth Court to address his claim on the merits.

As indicated above, in his concurring opinion, Justice Baer addressed the constitutionality of Sections 3303 and 3304 using the Commonwealth Court's substantive due process analysis. Justice Baer agreed with the plurality that Act 13's general mandate that municipalities enact specific zoning ordinances setting requirements for oil and gas production in every municipality of the Commonwealth, while only affording ineffective environmental protections and providing no other means for a municipality, zoning district, or resident thereof, to seek redress for particular objections or other remedies for the effects of drilling activities, would have an arbitrary and discriminatory impact on municipalities and residents throughout the Commonwealth. With respect to Sections 3303 and 3304, specifically, he opined that, because these sections required that municipalities enact ordinances that permit intrusion on, and accompanying damage to, private property, with no exception, nor provision of a means to remedy damage, they violated the substantive due process rights of the people, as the Commonwealth Court found.

After remand, consistent with our Court's order, the parties agreed upon five issues the Commonwealth Court was obliged to address: (1) whether Section 3302 and Sections 3305 through 3309 are severable from the now-enjoined Sections 3303 and 3304; (2) whether Section 3218.1 violates Article III, Section 32 of the Pennsylvania Constitution as a forbidden special law, or as a denial of equal protection, since it requires

that notice be given, after a spill from drilling operations, only to public drinking water systems; (3) whether Sections 3222.1(b)(10) and (b)(11) violate Article III, Section 32 of the Pennsylvania Constitution as a special law by restricting health professionals' access to information regarding chemicals or substances used in fracking which have been designated as confidential or proprietary; (4) whether Sections 3222.1(b)(10) and (b)(11) were enacted in violation of Article III, Section 3 of the Pennsylvania Constitution, since these provisions, and the remainder of Act 13, do not all pertain to a single subject; and (5) whether Section 3241 is unconstitutional since it grants a corporation the power of eminent domain to take private property for a private purpose.

An *en banc* panel of the Commonwealth Court,[23] in an opinion authored by then-President Judge Pellegrini, unanimously found the last sentence of Section 3302 was incapable of execution after our Court struck Sections 3303 and 3304, and enjoined the application and enforcement of Section 3302 insofar as it relates to those provisions.[24] A majority of the *en banc* panel held that Sections 3305 through 3309 comprised an integral part of the overall statutory scheme of statewide uniformity created by Act 13 and, in the absence of Sections 3303 and 3304, were no longer capable of execution; thus, the majority determined they could not be severed, and it enjoined the application and enforcement of these sections. Judge Brobson, joined by Judge McCullough, dissented on this point, as he considered the provisions contained in Sections 3305 through 3309 to be severable since, in his view, they could still be applied to address a local ordinance's alleged violation of the MPC, the remaining portion of Section 3302, and all of Chapter 32.

A majority of the court rejected Citizens' claim that Section 3218.1 was a special law which violated Article III, Section 32

23. The *en banc* panel consisted of then-President Judge Pellegrini, Judge Leadbetter, Judge Simpson, Judge Brobson and Judge McCullough. The record does no reveal why five judges, rather than the usual seven, sat on the *en banc* panel.

24. The PUC did not appeal this portion of the Commonwealth Court's order, and, thus, we do not review it in this opinion.

of the Pennsylvania Constitution, on the basis that the DEP did not regulate private wells, as well as its estimation that private water supplies could be more easily replaced in the event of a spill; hence, it reasoned that the separate warning requirements for private and public water suppliers were reasonable and related to a legitimate state interest.

Judge McCullough dissented to this holding on the grounds that she could discern no rational relationship to a legitimate governmental interest served by such a differentiation between public and private water suppliers. She rejected the majority's reliance on the lack of regulatory oversight of private wells by the DEP as a legitimate basis for the General Assembly to make such classifications, and noted that the DEP could obtain information regarding the location of private wells from DCNR "through inter-agency cooperation." Robinson III, 96 A.3d at 1125 (McCullough, J., dissenting).

The same majority, again over Judge McCullough's dissent, also found that Sections 3222.1(b)(10) and (b)(11) were not special laws since they did not single out any member of the oil and gas industry or any physician for special treatment, and they appropriately balanced the industry's need for protection of confidential and proprietary information against the public's need for access to such information for the purposes of medical treatment.

Judge McCullough's dissent focused on the fact that the exact language of the confidentiality agreement a health professional is required by these sections to execute is unknown.[25] However, she pointed out such agreements seemingly would not permit a health professional to "share the information in the peer-review setting, publish the clinical findings and proposed treatment plans in medical journals, or coordinate the outcome and treatment plans with other hospitals who later experience the same or a similar case." Id. In Judge McCul-

25. Act 13 does not set forth any parameters or guidelines for these agreements, but, instead, delegates general responsibility for promulgating these and other regulations under Act 13 to the Environmental Quality Board. See 58 Pa.C.S. § 3274. As of this writing, those regulations have yet to be promulgated.

lough's view, this restriction on health care providers' ability to exchange such information with other medical professionals does not serve a legitimate state interest, since it restricts the ability of the health care providers to "share and discuss solutions concerning chemical toxicity cases and symptomatic presentations that they may never have encountered." Id. at 1126. Consequently, Judge McCullough concluded that Dr. Khan raised a viable claim that these provisions violated the prohibition against special laws in Article III, Section 32.

The Commonwealth Court unanimously concluded that Section 3222.1(b)(11) did not violate Article III, Section 3, of the Pennsylvania Constitution.[26] The court found that Section 3222.1(b)(11) was a part of the overall statutory regime created by Section 3222.1 for those participating in oil and gas drilling activities and, thus, "germane to the main objective of Act 13, i.e., regulation of the oil and gas industry." Robinson III, 96 A.3d at 1119. Therefore, relying on our Court's decision in Pennsylvanians Against Gambling Expansion Fund Inc. v. Commonwealth of Pennsylvania, 583 Pa. 275, 877 A.2d 383 (2005) ("PAGE") (upholding the Gaming Act against an Article III, Section 3 challenge despite its multiple provisions, since all of its provisions were germane to the subject of gaming), the Commonwealth Court ruled that these provisions were not enacted in violation of Article III, Section 3.

Lastly, the Commonwealth Court unanimously ruled that Section 3241 did not violate the Fifth Amendment to the United States Constitution or Article I, Section 10 of the Pennsylvania Constitution by permitting a private corporation to appropriate a landowner's interest in real property for storage of natural or manufactured gas. The court reasoned that this section grants this power only to a corporation that is "empowered to transport, sell or store natural gas in this Commonwealth." Robinson III, 96 A.3d at 1114 (quoting 58 Pa.C.S. § 3241(a)). The court observed that this definition is

---

**26.** This section requires that, with the exception of general appropriations bills or bills which codify the law, "[n]o bill shall be passed containing more than one subject, which shall be clearly expressed in its title." Pa. Const., art. III, § 3.

consistent with the definition of "public utility" as set forth in Section 102 of the Public Utility Code, and the definition of a "public utility" as defined by the Business Corporation Law ("BCL") of 1988, as well as relevant PUC regulations, and noted, without elaboration, that Section 1102(a)(1)(i) of the Public Utility Code allows a public utility to obtain a certificate of public convenience from the PUC. Based on these statutory provisions, the court reasoned that Section 3241 confers the power of eminent domain only on corporations which are public utilities possessing a certificate of convenience, and, hence, are statutorily authorized to exercise such power; thus, the court concluded that Section 3241 does not constitute government-authorized taking of private property for the benefit of a private party.

The PUC (and its then-chairman Robert Powelson [27]) filed a direct appeal from the Commonwealth Court order, docketed at 104 MAP 2014, and Citizens, in turn, filed a cross-appeal, docketed at 105 MAP 2014, raising the following issues:

### A. Appeal of the PUC, 104 MAP 2014:

1. Where the legislature provides for the eligibility of local governments for Act 13 impact fees provided that the local governments' ordinances are in compliance with certain provisions of Pennsylvania law, did the Commonwealth Court err as a matter of law in concluding that the legislatively created procedures and remedies in 58 Pa. C.S. §§ 3305–3309 (for review of and/or to challenge local ordinances that violate, inter alia, Section 3302 and, by extension, Chapter 32 of Act 13) are inseverable from enjoined Sections 3303-3304 and therefore unenforceable?

2. Should the plurality decision of this Court in Robinson Twp. v. Commonwealth, [623 Pa. 564] 83 A.3d 901 (Pa. 2013) ("Robinson Twp. II") regarding Pa. Const. art. I, § 27 ("Section 27") be disavowed where the decision is (a) not precedential for this or any other court and (b) out of

27. The PUC's current chairwoman is Gladys M. Brown, who has been substituted as a party.

step with the wisdom of prior existing case law concerning Section 27? [28]

PUC's Brief at 4-5.[29]

### B. Citizens' Appeal, 105 MAP 2014:

1. [Did the Commonwealth Court err in … not finding that Sections 3222.1(b)(10) and (b)(11) are unconstitutional because they were enacted in violation of] the single-subject rule in Article III, Section 3 of the Pennsylvania Constitution?

2. Did the Commonwealth Court err in … not finding that Sections 3222.1(b)(10) and (b)(11) are unconstitutional to the extent that their prohibitions on what information health professionals may disclose constitutes a special law and/or violates constitutional equal protection guarantees in Article III, Section 32 of the Pennsylvania Constitution?

3. Did the Commonwealth Court err in … not finding that Section 3218.1 of Act 13 is unconstitutional to the extent that it requires notice to only public drinking water systems following an oil or gas related spill, but not private water suppliers, and is therefore a "special law" and/or violates equal protection in violation of Article III, Section 32 of the Pennsylvania Constitution?

4. Did the Commonwealth Court err in … not finding that Section 3241 of Act 13 is unconstitutional to the

---

**28.** In its brief, the PUC has enumerated a third "issue" which is, in actuality, an argument in defense of the Commonwealth Court's decision that Section 3241 was not an unconstitutional conferral of the power of eminent domain, and, thus, it is addressed within our discussion of the Citizens' eminent domain claim.

**29.** The other Commonwealth parties have filed separate briefs addressing a different aspect of the Commonwealth Court decision. The DEP's brief defends the Commonwealth Court's determination that Section 3218.1 does not violate Article III, Section 32 of the Pennsylvania Constitution as a special law; whereas, the brief of the Attorney General defends the Commonwealth Court's holding that Sections 3222.1(b)(10) and (11) do not constitute special laws, and do not violate the single subject rule of the Pennsylvania Constitution, and that tribunal's holding that Section 3241 does not allow an unconstitutional taking of private property for private purposes.

extent that it confers the power of eminent domain upon a corporation empowered to transport, sell, or store natural gas in this Commonwealth to take property of others for its operations, therefore permitting a taking for private purpose in violation of the Fifth Amendment of the United States Constitution and Article I, Sections 1 and 10 of the Pennsylvania Constitution?

Citizens' Initial Brief at 4-5.[30]

Our Court granted oral argument with respect to the PUC's first issue, and Citizens' issues 2, 3, and 4, which was held on March 9, 2016.

## II. Discussion

### A. PUC's Appeal at 104 MAP 2014

#### 1. Severability of Sections 3305-3309

The PUC argues that Sections 3305 to 3309 may be severed from Sections 3303 and 3304. With respect to Section 3305, the PUC argues that the remaining provisions of Section 3305(a) can and should be enforced since the PUC claims that, under that section, it retains the authority to review local ordinances, and the attendant power to issue advisory opinions regarding whether such ordinances comply with the MPC, or with the remaining valid portions of Chapters 32 and 33 of Act 13. In the view of the PUC, such a construction would comport with our Court's statement in Robinson II that only those portions of Sections 3305 through 3309 which implement or enforce unconstitutional Sections 3303 and 3304 should be deemed invalid.

The PUC maintains that Section 3306 should also be severable since, from its perspective, that section merely extends the jurisdiction of the Commonwealth Court to permit a person aggrieved by a local ordinance which violates the MPC, or the

30. For ease of discussion, we have re-ordered Citizens' issues, and divided into two issues their third issue, which embodied two discrete challenges: a challenge to Act 13, as a whole, under Article III, Section 3 of the Pennsylvania Constitution, which is now enumerated as issue 1, and a challenge to Sections 3222.1(b)(10) and (b)(11) under Article III, Section 32, which is listed as issue 3.

remaining valid portions of Chapters 32 and 33, to bring an action directly in that tribunal without first having to obtain PUC review. With respect to Section 3308, the PUC points out that this section is the only means of enforcing the requirement of Act 13 that impact fees may be distributed only to municipalities whose ordinances do not violate the MPC, or Chapters 32 and 33, because the MPC does not address the impact fees authorized by Act 13. The PUC argues that this provision was recognized by our Court as being "relatively independent of other parts of Act 13," and, thus, contends it still retains validity in situations where the PUC, the Commonwealth Court, or our Court issues an order finding that a local ordinance violates the MPC or the remaining valid portions of Chapters 32 and 33. PUC's Brief at 18 (quoting Robinson II, 83 A.3d at 998). The PUC also cites the fact that the legislature did not include a non-severability clause in Act 13; hence, it reasons that this is evidence of the General Assembly's intent that its various provisions are able to operate independently.

Citizens respond by delineating what they consider the effect of Act 13, as well as our decision in Robinson II, on the operation and framework of local land use regulation via municipal zoning ordinances. Citizens note that, prior to Act 13, municipalities could regulate, via ordinance, areas where drilling could take place within a municipality, as the 1984 Act did not preclude such regulation, but, conversely, municipalities could not enact ordinances which purported to set standards for the operation of such wells to the extent that such standards conflicted with those set forth in the Oil and Gas Act.[31] Citizens' Initial Brief at 18 (citing Huntley & Huntley v.

---

31. Citizens also challenge the standing of the PUC to litigate this issue, contending that it is not adversely affected by the Commonwealth Court's disposition. The PUC responds that this issue was not raised by Citizens below. Our review of the record indicates that Citizens did not preserve this objection in the proceeding below, and, indeed, joined the PUC in the initial litigation. Consequently, Citizens' standing challenge is waived in this appeal. See Brayman Construction Corporation v. Commonwealth Department of Transportation, 608 Pa. 584, 13 A.3d 925, 931 (2011) (failure to raise issue of party's standing in lower court results in waiver of question before our Court under Pa.R.A.P. 302(a)).

Borough Council of Oakmont, 600 Pa. 207, 964 A.2d 855 (2009)). Citizens view the effect of our decision in Robinson II, as reestablishing this duality of regulatory authority between state and local government such that, under the procedures established by the MPC, local zoning boards and governing bodies are, again, given the primary responsibility of resolving substantive challenges to zoning ordinances, which, by their nature, require the presentation and consideration by those bodies of large amounts of evidence and the balancing of multiple competing factors including the use and enjoyment of property, the quality of its residents' life, the residents' health, safety and welfare, and the conservation of natural resources. Citizens also have the ability under the MPC to have questions regarding the constitutionality of ordinances resolved by the courts of common pleas. Additionally, under the MPC, citizens of a particular municipality are allowed to intervene in any challenge to a zoning ordinance and to have their views heard.

Citizens argue that the framework established by Sections 3303 through 3309 was erected specifically for the purpose of changing this paradigm by deliberately creating a uniform statewide regulatory land use framework governing oil and gas operations and eliminating local governmental control of such matters. Citizens note that Sections 3303 and 3304 established a uniform maximum ceiling for land use protections which local municipalities were prohibited from exceeding through passage of ordinances. Citizens point out that Sections 3305 through 3309 achieve the goal of maintaining this ceiling for all municipal ordinances regarding oil and gas operations by setting up a statewide review mechanism which eliminated local involvement in such decisions.

Citizens contend that Section 3305, which gives the PUC the power to issue orders regarding the compatibility of local ordinances with the uniform zoning framework established in Section 3304, or with other non-zoning regulations pertaining to oil and gas operations, and Section 3306, which gives the Commonwealth Court original jurisdiction over civil actions by parties claiming to be aggrieved by the enactment or operation of municipal ordinances, established what Citizens de-

scribe as "relatively straightforward legal reviews" by both bodies. Citizens' Second Brief at 27. According to Citizens, this process was intended to be a quick facial examination of the terms of the ordinances by either the PUC or the Commonwealth Court to see if they comported with Section 3304, but it was not intended to be the typical type of ordinance review that local governing bodies engage in, which is characterized by deliberative fact finding with significant input from local citizens who are afforded maximum opportunity to participate. Indeed, Citizens assert, the fact that this ordinance review was restricted under these sections to only taking place in exclusively statewide forums is evidence of Act 13's intent to purposefully exclude local citizens from meaningful participation in the process. Likewise, Citizens contend the imposition of counsel fees and financial penalties provided in Sections 3307 and 3308 was done for the purpose of enforcing statewide conformity in local ordinances governing oil and gas operations set by Sections 3304 and 3305.

Citizens add that, since Sections 3304 and 3305 are now enjoined, there is no longer a uniform state ceiling on local ordinances governing the siting of wells, which was the entire objective of Act 13; thus, the enforcement framework of Sections 3303 through 3309, which Citizens contend serves to ensure such uniformity, is no longer necessary. Instead, Citizens argue, the pre-Act 13 framework governing challenges to local ordinances established by the MPC will, once again, govern, with challenges to ordinances concerning the siting of wells brought before local governing bodies, or the courts of common pleas.

Citizens aver that, if Sections 3305 through 3309 are permitted to remain operable, however, then there is a danger that the PUC and the drilling industry will use them to enforce the remaining setback provisions of the act contained in Section 3215(a),[32] which our Court did not invalidate in Robinson II, but nevertheless viewed as "constitutionally suspect," id. 83 A.3d at 973 n. 55, in order to make them the maximum allowable setback distances everywhere in the Commonwealth.

32. See supra at note 4.

In Citizens' view, this would, once again, establish a statewide ceiling on setback distances, which no local ordinance could exceed, and, hence, constitutes the same type of action our Court found unconstitutional in Robinson II. According to Citizens, such an interpretation would allow Robinson II to be circumvented.

Citizens further highlight what they perceive as significant difficulties and disruption to the well settled processes established by the MPC governing the manner in which a challenge to an ordinance is to proceed, as well as substantial financial costs to municipalities and participatory burdens on our citizenry if Sections 3303 to 3309 are allowed to stand. Citizens note that, if these provisions remain, then any challenge to a local ordinance may now be brought to the PUC for review and an opinion which may result in serious financial consequences to a municipality. Citizens additionally contend that the PUC has no experience acting in the role of fact finder, like a local zoning hearing board, and it possesses insufficient staff to handle the multiplicity of such challenges which would ensue from around the state. Additionally, Citizens maintain that, if such challenges are brought before the Commonwealth Court, this will also entail a significant burden on that court in the form of a vastly increased caseload, and, in any event, Citizens view that tribunal to be ill-equipped to perform fact finding functions.

Citizens argue that these prospects demonstrate that Sections 3305 to 3309 can no longer function in accordance with their original legislative purpose. Citizens aver that, to allow Sections 3305 to 3309 to continue to be executed with respect to all local ordinances would lead to an unreasonable result, inasmuch as both the PUC and the Commonwealth Court would then have to determine whether each challenged local ordinance governs oil and unconventional gas well operations, which are the only type of ordinances they are still empowered to review in the wake of Robinson II, or, rather, is a zoning provision, challenges to which now must be brought, as required by the MPC, before the local governing body or the court of common pleas.

Citizens highlight the fact that, even if a local ordinance governs oil and gas well operations, and is challengeable before the PUC or the Commonwealth Court on constitutional or other grounds, those bodies would then be required to balance the concerns of a municipality's local residents—i.e., whether the ordinance properly protects their constitutional rights to use and enjoyment of their property—against the rights of the holders of interests in oil and gas to utilize those interests. Again, Citizens stress this is a fact-intensive process which requires development of a hearing record, and, thus, is not the speedy process contemplated by the legislature for ordinance reviews by these bodies under Sections 3303 and 3304; it is also a process that, because the relevant tribunals who conduct it are situated in Harrisburg, discourages the involvement of the municipality's residents.[33]

**33.** The Pennsylvania State Association of Township Supervisors has filed an *amicus* brief, in which it advances the same basic contentions as Citizens regarding the purported inoperability of Sections 3305-3309 in the absence of Sections 3304 and 3305.

The Clean Air Council, Clean Water Action, the Natural Resources Defense Council, and the Sierra Club have jointly filed a brief detailing policy reasons why review of land use decisions made by local government concerning oil and gas drilling should, once again, proceed under the MPC. They emphasize the traditional and vital historical role of local zoning laws enacted by municipalities in protecting these interests, and the long-standing recognition that municipalities can use these laws to restrict the permissible situs of industrial activity, such as fracking, occurring within their borders, in order to protect, in other areas of the community, residents' quality of life and their ability to use and enjoy property. They point out that the various provisions of the MPC, such as those which require development of a comprehensive land use plan and allow coordinated planning between municipalities and other local governmental bodies like counties, reflect the fact that the MPC, as a whole, constitutes a well-established and deliberate policy choice that land use decisions be made at the local level by elected officials who live in the community, because they best understand the community's special character and the unique needs of its residents. Thus in *amici's* view, such governmental officials are best suited to evaluate the suitability of certain types of land use activities.

*Amici* further highlight that the PUC has no experience in municipal land use matters, as it is a state level administrative agency tasked with a variety of diverse regulatory functions—primarily the setting of rates for utility service, but, also, enforcing rules governing motor carriers and the telecommunications industry, as well as the inspection of energy facilities. Indeed, according to *amici*, the lack of experience and knowledge in this area was evidenced by the fact that, after the passage

▆▆▆▆ The question of whether unconstitutional portions of a statutory enactment may be severed from the remainder is a pure question of law; thus, our standard of review is *de novo* and our scope of review is plenary. Commonwealth v. Hopkins, 632 Pa. 36, 117 A.3d 247, 255 (2015). As we noted in Robinson II, Act 13 does not contain a severability provision;[34] thus, our analysis of this question is guided by Section 1925 of the Statutory Construction Act, 1 Pa.C.S. § 1501 et seq. which provides:

### § 1925. Constitutional construction of statutes

The provisions of every statute shall be severable. If any provision of any statute or the application thereof to any person or circumstance is held invalid, the remainder of the statute, and the application of such provision to other persons or circumstances, shall not be affected thereby, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are

of Act 13, the PUC was forced to hire outside counsel to advise it on zoning matters. *Amici* assert that the PUC's already thin resources and expertise in this area would be even more severely strained if Sections 3305 through 3309 were permitted to stay in effect.

The Pennsylvania Independent Oil and Gas Association, the Marcellus Shale Coalition, and the American Petroleum Institute have filed a joint *amicus* brief largely tracking the argument of the PUC that Sections 3305 through 3309 can be severed from Sections 3303 and 3304. In their view, Sections 3305 through 3309 retain continued viability in that they can be used whenever a municipality passes a local ordinance that violates any of the remaining provisions of Chapters 32 and 33 that have not been stricken as unconstitutional, as well as in situations where a municipality passes a local ordinance that violates the MPC.

**34.** Our Court has previously opined that the inclusion by the General Assembly of a provision concerning severability in a particular enactment is not dispositive of our analysis; rather, such clauses are to be given appropriate weight as a tool of statutory construction. Stilp v. Commonwealth, 588 Pa. 539, 905 A.2d 918, 972 (2006); Saulsbury v. Bethlehem Steel Company, 413 Pa. 316, 196 A.2d 664, 667 (1964).

incapable of being executed in accordance with the legislative intent.

1 Pa.C.S. § 1925.

By its terms, Section 1925 creates a general presumption of severability for every legislative enactment; however, this presumption is not unassailable, as Section 1925 establishes two circumstances under which the presumption is overcome: (1) if "the valid provisions are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one," or (2) if "the remaining valid provisions, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent." Id.; see also PAGE, 877 A.2d at 403 (quoting 1 Pa.C.S. § 1925). The determination of whether either of these two exceptions are applicable to a particular statute is a question of statutory construction, with legislative intent being our Court's guiding consideration. Hopkins, 117 A.3d at 259; Saulsbury, 196 A.2d at 667. Thus, our Court must necessarily consider whether, if the void provisions are stricken, the statute will continue to effectuate the original legislative purpose behind its enactment.

As our Court observed in Robinson II, Act 13, which was the first significant overhaul of state statutes governing oil and gas drilling in 30 years, constituted a "land use revolution respecting oil and gas operations" within this Commonwealth. Robinson II, 83 A.3d at 974. In that opinion, our Court recognized that the primary purpose of Act 13 was "to provide a maximally favorable environment for industry operators to exploit Pennsylvania's oil and natural gas resources, including those in the Marcellus Shale Formation." Id. at 975 (citing 58 Pa.C.S. § 3202). Act 13 endeavored to accomplish this purpose by effectuating a fundamental transformation of the division and scope of regulatory authority over oil and gas extraction activities between the Commonwealth and its municipal governments.

As noted above, Act 13 amended and revised the 1984 Act, Section 601.602 of which forbade municipalities from enacting, pursuant to their general police powers, local ordinances that regulated "oil and gas operations," or from enacting local ordinances under the MPC or the Flood Plain Management Act "which impose conditions, requirements or limitations on the same features of oil and gas operations regulated by this act or that accomplish the same purposes as set forth in this act." 58 P.S. § 601.602 (repealed April 12, 2012). Our Court interpreted this language as preempting only the power of municipalities to regulate, via ordinance, the features of well operations which were otherwise governed by the 1984 Act; however, we concluded that it did not bar municipalities from enacting, pursuant to the MPC, traditional zoning regulations which established zoning districts within municipal boundaries, and specifying which property uses were permitted therein, even if such zoning regulations completely prohibited oil and gas drilling within certain districts, such as agricultural or residential ones. Huntley & Huntley v. Borough Council of Oakmont, 600 Pa. 207, 964 A.2d 855 (2009); Range Resources v. Salem Township, 600 Pa. 231, 964 A.2d 869 (2009). Likewise, the 1984 Act did not purport to abrogate the duty of municipalities in enacting local ordinances—as part of the global responsibility placed on them by the MPC to protect and promote the health, safety, morals, and general welfare of their residents [35]—to protect and preserve, generally, the natural, scenic and historic values of the environment within their communities, and to specifically protect and preserve sensitive areas therein such as forests, wetlands, aquifers and floodplains. See 53 Pa.C.S. § 10604(1) ("The provisions of zoning ordinances shall be designed: (1) To promote, protect, and facilitate ... the public health, safety, morals, and the general welfare ... preservation of the natural, scenic and historic

35. As a plurality of our Court recognized in Robinson II, a municipality's duty to protect the environment for the benefit of its residents is not merely a creation of statute, but rather an affirmative obligation placed on these entities by Article I, Section 27 of our Commonwealth's Constitution. Robinson II, 83 A.3d at 977–78.

values in the environment and preservation of forests, wetlands, aquifers and floodplains.").

Section 3302, as enacted by Act 13, while retaining the limited preemption language of former Section 601.602, contains an additional final sentence, which the Commonwealth Court struck in this case, indicating that this section, working in conjunction with the remainder of Chapter 33, preempted the established regulatory authority of municipalities discussed above: "[t]he Commonwealth, by this section, preempts and supersedes the regulation of oil and gas operations as provided in this chapter." 58 Pa.C.S. § 3302. Chapter 33 achieved this preemption of local ordinances through now-enjoined Sections 3303 [36] and 3304,[37] which had no analogous predecessors in the 1984 Act.

**36.** Section 3303 provides:

> Notwithstanding any other law to the contrary, environmental acts are of Statewide concern and, to the extent that they regulate oil and gas operations, occupy the entire field of regulation, to the exclusion of all local ordinances. The Commonwealth by this section, preempts and supersedes the local regulation of oil and gas operations regulated by the environmental acts, as provided in this chapter.
> 58 Pa.C.S. § 3303.

**37.** Section 3304 provides:

> **§ 3304. Uniformity of local ordinances**
> (a) **General rule.**—In addition to the restrictions contained in sections 3302 (relating to oil and gas operations regulated pursuant to Chapter 32) and 3303 (relating to oil and gas operations regulated by environmental acts), all local ordinances regulating oil and gas operations shall allow for the reasonable development of oil and gas resources.
> (b) Reasonable development of oil and gas resources.—In order to allow the for the reasonable development of oil and gas resources, a local ordinance:
> (1) Shall allow well and pipeline location assessment operations, including seismic operations and related activities conducted in accordance with all applicable Federal and State laws and regulations relating to the storage and use of explosives throughout every local government.
> (2) May not impose conditions, requirements or limitations on the construction of oil and gas operations that are more stringent than conditions, requirements or limitations imposed on construction activities for other industrial uses within the geographic boundaries of the local government.
> (3) May not impose conditions, requirements or limitations on the heights of structures, screening and fencing, lighting or noise relating to

permanent oil and gas operations that are more stringent than the conditions, requirements or limitations imposed on other industrial uses or other land development within the particular zoning district where the oil and gas operations are situated within the local government.

(4) Shall have a review period for permitted uses that does not exceed 30 days for complete submissions or that does not exceed 120 days for conditional uses.

(5) Shall authorize oil and gas operations, other than activities at impoundment areas, compressor stations and processing plants, as a permitted use in all zoning districts.

(5.1) Notwithstanding section 3215 (relating to well location restrictions), may prohibit, or permit only as a conditional use, wells or well sites otherwise permitted under paragraph (5) within a residential district if the well site cannot be placed so that the wellhead is at least 500 feet from any existing building. In a residential district, all of the following apply:

(i) A well site may not be located so that the outer edge of the well pad is closer than 300 feet from an existing building.

(ii) Except as set forth in paragraph (5) and this paragraph, oil and gas operations, other than the placement, use and repair of oil and gas pipelines, water pipelines, access roads or security facilities, may not take place within 300 feet of an existing building.

(6) Shall authorize impoundment areas used for oil and gas operations as a permitted use in all zoning districts, provided that the edge of any impoundment area shall not be located closer than 300 feet from an existing building.

(7) Shall authorize natural gas compressor stations as a permitted use in agricultural and industrial zoning districts and as a conditional use in all other zoning districts, if the natural gas compressor building meets the following standards:

(i) is located 750 feet or more from the nearest existing building or 200 feet from the nearest lot line, whichever is greater, unless waived by the owner of the building or adjoining lot; and

(ii) the noise level does not exceed a noise standard of 60dbA at the nearest property line or the applicable standard imposed by Federal law, whichever is less.

(8) Shall authorize a natural gas processing plant as a permitted use in an industrial zoning district and as conditional uses in agricultural zoning districts if all of the following apply:

(i) The natural gas processing plant building is located at the greater of at least 750 feet from the nearest existing building or at least 200 feet from the nearest lot line unless waived by the owner of the building or adjoining lot.

(ii) The noise level of the natural gas processing plant building does not exceed a noise standard of 60dbA at the nearest property line or the applicable standard imposed by Federal law, whichever is less.

(9) Shall impose restrictions on vehicular access routes for overweight vehicles only as authorized under 75 Pa.C.S. (relating to vehicles) or the MPC.

(10) May not impose limits or conditions on subterranean operations or hours of operation of compressor stations and processing plants or

As we recognized in Robinson II, the legislature, through the inclusion of Section 3303, attempted to entirely foreclose the ability of municipalities to afford their residents environmental protections, via the enactment of any zoning ordinances tailored to address unique local environmental needs and conditions, whenever those ordinances "might be perceived as affecting oil and gas operations." Robinson II, 83 A.3d at 978. Instead, municipalities were mandated by this section to conform any new ordinance, or existing ordinance, to extant state laws and regulations that set minimum statewide environmental protections related to oil and gas production activities. State laws and regulations were, thus, intended to be, as Citizens have characterized them, statewide "ceilings" or limits on environmental protections, applicable in every municipality in the Commonwealth, which no local ordinance could exceed, nor deviate from, to address a distinctive local environmental issue of importance to the residents of the municipality. The state environmental standards for oil and gas drilling thus became the *de facto* local standards for every municipality.

The purpose of Section 3304 was to prohibit municipalities from enacting any local ordinance under which they were able to: designate the specific locations in their communities where the drilling of oil and unconventional gas wells would be allowed; designate where production facilities used in the oil and gas extraction process would be permitted to operate; regulate the construction and size of the physical equipment and facilities used in the oil and gas extraction and production process; limit the noise, hours of operation of oil and gas drilling, and production equipment and facilities; or place

hours of operation for the drilling of oil and gas wells or the assembly and disassembly of drilling rigs.

(11) May not increase setback distances set forth in Chapter 32 (relating to development) or this chapter. A local ordinance may impose setback distances that are not regulated by or set forth in Chapter 32 or this chapter if the setbacks are no more stringent than those for other industrial uses within the geographic boundaries of the local government.

58 Pa.C.S. § 3304.

other restrictions or conditions on their subterranean operations. Id. at 971–72.

Additionally, municipalities were not previously precluded by the 1984 Act from adopting ordinances, pursuant to their authority to regulate the siting of oil and unconventional gas wells, see Huntley, Range, supra, which furnished additional protections to residents' property, water, supplies, bodies of water, and wetlands by specifying setback restrictions for oil and unconventional gas wells which were in excess of those required for a driller to obtain a DEP permit. Section 3304(b)(11), however, expressly deprived municipalities of their ability to do so. It specified that a local ordinance: "[m]ay not increase setback distances set forth in Chapter 32 (relating to development) or this chapter." 58 Pa.C.S. § 3304(b)(11). Once more, then, Section 3304, as a whole, substituted statewide standards in every municipality across the Commonwealth for matters that previously could be regulated by municipal governments through the enactment of local ordinances as part of their regular zoning processes.

Certain other provisions of Chapter 32 were designed to work in tandem with Section 3304 to reinforce the restriction on the authority of municipalities to regulate the siting of oil and gas wells within their communities in relation to the prescribed distances for such wells from buildings, water wells, bodies of water, and wetlands. Section 3215(a) establishes a horizontal setback distance of 200 feet for conventional oil and gas wells from existing buildings or water wells, and 500 feet for an unconventional well from the same entities. 58 Pa.C.S. § 3215(a). However, this provision allows those setback distances to be overridden, and requires the DEP to grant a permit for drilling at closer distances, without the property owners' consent, if the "distance restriction would deprive the owner of the oil and gas rights of the right to produce or share in the oil and gas underlying the surface tract" upon submitting a plan to take unspecified measures to "ensure safety and protection of affected persons and property." Id.

Also under this section, unconventional wells cannot be drilled within 1,000 feet of "any existing water well, surface water intake, reservoir or other water supply extraction point used by a water purveyor" without the purveyor's consent. Id. Again, in the event the purveyor withholds his or her consent, and enforcement of the distance restriction "would deprive the owner of the oil and gas rights of the right to produce or share in the oil or gas underlying the surface tract," the DEP is required to grant a variance from the distance restriction upon "submission of a plan identifying the additional measures, facilities or practices as prescribed by the [DEP] to be employed during well site construction, drilling and operations." Id. Notably, under the 1984 Act, the DEP had discretion to grant such a variance and was not compelled to do so as under Act 13.[38]

Section 3215(b), which our Court enjoined in Robinson II, imposed minimum setback distances that oil and unconventional gas wells, and areas disturbed by drilling of such wells, were required to remain from streams, springs, bodies of water and wetlands, in order for their owners to obtain a drilling permit from the DEP. However, once more, unlike under the 1984 Act,[39] the granting of waivers by the DEP of such minimum setback distance restrictions was made mandatory by Act 13. The DEP was required to grant a waiver "upon submission of a plan identifying additional measures, facilities or practices to be employed during well site constriction, drilling and operations necessary to protect the waters of this Commonwealth." 58 Pa.C.S. §§ 3215(b)(4).

Section 3215(d), likewise enjoined by our Court, precluded municipalities from having any meaningful opportunity to alter the outcome of the DEP's permitting decision based on the specific concerns and needs of the residents of the municipality. Although municipalities are allowed by Section 3212.1 to submit comments to the DEP about a proposed unconventional gas well to be drilled within its borders regarding "local conditions or circumstances which the municipality has deter-

38. See 58 P.S. § 601.205(a) (repealed April 12, 2012).
39. See 58 P.S. § 601.205(b) (repealed April 12, 2012).

mined should be considered" by the DEP in making its permit decision, Section 3215(d) did not obligate the DEP to consider those comments in making its final decision. Id. §§ 3212.1, 3215(d). Further, municipalities were barred by Section 3215(d) from obtaining further review of the DEP's ultimate permit decision. Consequently, these provisions, viewed together, indicate that Section 3215 was structured to effectively give to the DEP final decisional authority on where oil and gas wells would be placed within a municipality's borders. Inasmuch as the DEP was constrained to apply the setback distances that such wells were required to remain from residents' property and water supplies as set forth in Section 3215(a) and (b), and could only grant downward variances therefrom, and as municipalities were precluded by Section 3304(b)(11) from enhancing these setback distances via local ordinance, such distances were obviously intended to be the setback standards applicable for oil and gas wells within every municipality in the Commonwealth.

These statutory provisions, when viewed in conjunction with the remaining provisions of Act 32 that govern other operational aspects of oil and gas well development, evidence the legislature's overarching objective to have Act 13 provide a singular statewide zoning and permitting process for all oil and gas wells effective throughout the Commonwealth, which utilized a regulatory framework comprised of one set of uniform standards and guidelines governing the siting and operation of such wells. See Robinson II, 83 A.3d at 915 ("Chapter 32 ... defines statewide limitations on oil and gas development. Chapter 33 ... prohibits any local regulation of oil and gas operations, including via environmental legislation, and requires statewide uniformity among local zoning ordinances with respect to the development of oil and gas resources."); id. at 931 (observing that "Section 3304 ... implements a uniform and statewide regulatory regime of the oil and gas industry by articulating narrow parameters within which local government may adopt ordinances that impinge upon the development of these resources"); id. at 973 ("Section 3215(d) limits the ability of local government to have any meaningful say respecting

drilling permits and well locations in their jurisdictions"); id. at 980 (Act 13 "offer[s] minimal statewide protections while disabling local government from mitigating the impact of oil and gas development at a local level"); see also Robinson II, 83 A.3d at 1000 n. 1 (Baer J. concurring) ("[T]he thrust of Act 13 is to establish a uniform, statewide oil and gas well permitting and zoning regimen, and to repudiate the ability of political subdivisions to enact or enforce land-use planning and zoning ordinances not in conformance therewith."); Robinson III, 96 A.3d at 1121 ("Apparently acceding to the oil and gas industry's claims that local ordinances tailored to local conditions were purportedly impeding their oil and gas development and that a uniform law was necessary, the General Assembly enacted Act 13 which contained a number of provisions requiring local governments to enact uniform zoning provisions and preempted them from enacting any other laws that dealt directly with oil and gas operations.").

Sections 3305 through 3309, which our Court has described as the "enforcement mechanism" of Act 13, Robinson II, 83 A.3d at 972, further the legislative goal of maintaining this statewide regulatory uniformity, as well as promote Act 13's primary objective of optimizing oil and gas development, by providing an expedited and unitary review process for all local ordinances to ensure that they do not run afoul of any of the statewide standards for oil and gas wells established by Act 13. As discussed previously, Section 3305 vests the PUC with the authority to review any local ordinance upon petition of an aggrieved "owner or operator of an oil or gas operation," or "person residing within the geographic boundaries of a local government" in order to determine whether it violates any of the provisions of "the MPC, [Chapter 33] or Chapter 32." 58 Pa.C.S. § 3305. Section 3306 additionally allows "any person who is aggrieved by the enactment or enforcement of a local ordinance that violates the MPC, [Chapter 33] or Chapter 32" to bring "an action in Commonwealth Court to invalidate the ordinance or enjoin its enforcement." Id. § 3306. These review procedures were intended to facilitate the drilling of new oil and gas wells as quickly as possible, by removing what the

Commonwealth viewed as potential regulatory impediments to such development posed by local ordinances. See Robinson II, 83 A.3d at 981 (discussing the Commonwealth's admission that the procedures established by Act 13 were intended to address what it perceived would be "local efforts to derail industry development" and to prevent "a 'balkanization' of legal regimes with which the industry would have to comply."). Consequently, the procedures established by Sections 3305 and 3306 purposely bypass the well-established ordinance review procedures of the MPC, which, necessarily, involve the deliberative and adjudicative processes of the municipal government which enacted the local ordinance, and the right of review of the official municipal government action regarding the ordinance in the courts of common pleas where the municipality is situated. See generally 53 P.S. § 10916.1(a)(1), (2) (requiring that substantive challenges to the validity of a local ordinance by a landowner be brought before the zoning hearing board of a municipality, or the municipality's governing body, "together with a request for a curative amendment"); § 10916.1(b) (requiring "[p]ersons aggrieved by a use or development permitted on the land of another by an ordinance" to bring a substantive challenge to the ordinance before the zoning hearing board); 53 P.S. § 11002–A(a) (providing for appeal of a land use decision by local governing body to "court of common pleas of the judicial district wherein the land is located.").

As Citizens and their *amici* have argued, the ordinance review procedures provided by the MPC are, by their nature, fact-intensive processes in which the zoning hearing board or local governing body, when confronted with a substantive challenge to a local land use decision, takes evidence and considers, factually, how an ordinance or ordinances which govern a proposed land use affects the aggrieved party's right to use and enjoyment of his or her property. As part of this process, these local governmental entities must, necessarily, consider evidence relating to whether the proposed use of property is consistent with both the terms of the ordinance and its locally tailored policy goals, which take into account "the character of the municipality, the needs of the citizens and the suitabilities and special nature of particular parts of

the municipality." 53 P.S. § 10603; see also id. § 10916.1 (enumerating procedures for challenge to ordinances before zoning hearing board and governing body).

If an ordinance excludes a proposed use entirely, such as oil and gas well drilling, then the zoning hearing board or governing body may be asked to consider whether remedial action such as a variance, conditional use exception, or curative amendment is warranted to allow for the excluded use. In making this determination, the zoning hearing board or governing body again considers evidence relating to uniquely local factors, such as the physical characteristics of the land, the character of the neighborhood, the use and development of neighboring property, as well as the overall purpose of the MPC and the ordinance itself. See generally 53 P.S. §§ 10910.2, 10912.1, 10913.2 (enumerating specific factors which zoning hearing board or governing body is required to consider in making determination as to whether granting of a variance, special exception or conditional use is warranted).

The zoning hearing board or governing body, thus, function in the capacity of triers of fact with respect to the weighing and balancing of these considerations. For instance, the zoning hearing board conducts hearings at which evidence is presented by the witnesses of the respective parties who are the municipality, all persons affected by the application, and any civic and community organizations which have been granted permission to appear by the board, and the board is required to make findings of fact. See id. § 10908. The governing body, or its designee, likewise conducts similar hearings on conditional use applications, and is also specifically charged with making findings of fact. See id. § 10913.2. Consequently, both entities develop an extensive factual record in support of their decisions which is then utilized by the courts of common pleas in which the municipality is located to conduct judicial review. See id. § 11003-A. The trial court is prohibited from disturbing the factual findings made by the local agencies if they are supported by substantial evidence; however, it too may receive additional factual evidence from witnesses relating to the above-enumerated factors, if necessary, to augment the previously developed record. See id. § 11005-A.

By contrast, as we recognized in Robinson II, under Act 13, in its original form, the zoning role of local government was "reduced to *pro forma* accommodation," 83 A.3d at 972, of the statewide standards established by Act 13, inasmuch as all local ordinances were required to conform to those standards and could not exceed the regulatory ceilings set by them, no matter what unique local conditions or needs existed in a particular municipality. Thus, given these explicit constraints on the extent to which local ordinances could regulate the siting and environmental impacts of oil and gas drilling activities, the type of review of a local ordinance that the PUC or the Commonwealth Court was envisioned to conduct under Sections 3305 and 3306, was, accordingly, a purely legal review in which the specific terms of a local ordinance would be examined by those bodies to see whether or not those terms comported with the uniform statewide standards provided by Act 13.

Our Court's striking of Sections 3215(b) and (d), and Sections 3303 and 3304, as well as the Commonwealth Court's striking of the last sentence of Section 3302, has now irrevocably altered the nature of this review.[40] Given the absence of those statutory provisions, municipalities may again, as they did prior to the passage of Act 13, regulate the environmental impact, setback distances, and the siting of oil and gas wells in land use districts through local ordinances enacted in accordance with the provisions of the MPC or the Flood Plain Management Act, provided that such ordinances do not impose conditions on the features of well operations which the remaining valid provisions of Act 13 regulate. Huntley, 964 A.2d at 866 n. 11. As a result, municipalities are once more empowered to enact zoning ordinances relating to those matters pursuant to their responsibility to secure the health, safety, or general welfare of the residents of their community. Hoffman Min. Company v. Zoning Hearing Board of Adams Township, Cambria Cty., 612 Pa. 598, 32 A.3d 587, 605 (2011). In so doing, they will, as before, be required to give "consider-

---

40. As previously indicated, this portion of the Commonwealth Court's order has not been appealed. See supra note 23.

ation to the character of the municipality, the needs of the citizens and the suitabilities and special nature of particular parts of the municipality." Id. (quoting 53 P.S. § 10603(a)). As these factors will necessarily vary from municipality to municipality depending on local conditions and needs of residents, there will not be the statewide uniformity in local ordinances governing these subjects which Act 13 sought to achieve. Correspondingly, review of local ordinances by the PUC and Commonwealth Court under Sections 3305 and 3306 will no longer involve the comparison of a local ordinance against a single set of uniform, statewide legal standards, as contemplated by Act 13 in its original form. Rather, absent the stricken provisions of Act 13, the PUC or the Commonwealth Court, when reviewing local ordinances, will now have to function, in essence, as a statewide zoning hearing board, and conduct the type of fact-intensive inquiry traditionally performed by local zoning hearing boards or local governments under the MPC detailed above.

It is, thus, reasonable to conclude, in light of the aforementioned legislative objectives behind the enactment of Sections 3305 and 3306—i.e. to speed and simplify the local ordinance review process—that, absent the invalidated portions of Act 13, the legislature would not have passed these sections into law merely to have the PUC and the Commonwealth Court engage in the same type of measured and deliberative review process for local ordinances which the MPC already provides. Consequently, we hold that, absent the stricken provisions of Act 13, Sections 3305 and 3306 are no longer capable of being executed in accordance with the original intent of the General Assembly, and, thus, they cannot be severed. 1 Pa.C.S. § 1925; PAGE, supra.

With respect to Sections 3307 to 3309, these statutory provisions impose specific financial penalties on municipalities if, as the result of the review process set forth in Sections 3305 through 3306, it is determined that they enacted an ordinance which contravened the statewide standards set by Act 13. They are, thus, inextricably linked to the review provisions of those sections and, likewise, cannot be severed. See Heller v.

Frankston, 504 Pa. 528, 475 A.2d 1291, 1296 (1984) (statutory provisions are not severable if they are so interwoven with other void provisions as to be inseparable). The order of the Commonwealth Court is, therefore, affirmed as to this issue.

## 2. Whether our Court should disavow the Article I, Section 27 analysis utilized by the plurality in our Robinson II, decision.

We turn now to the PUC's contention that Citizens, below, and in their cross-appeal, have predicated their challenge to Section 3218.1 on the argument that the General Assembly breached its fiduciary obligations as trustee of the environment imposed by Article I, Section 27 of the Pennsylvania Constitution, and that, in so doing, they have improperly relied on former Chief Justice Castille's plurality opinion in Robinson II as the precedential foundation for this contention. The PUC then bootstraps this interpretation of Citizens' argument into a general attack on the rationale of that plurality opinion, characterizing its Article I, Section 27 analysis as "unworkable," and urges that our Court "disavow any further reliance on it." PUC's Brief at 20. The PUC further requests that our Court return to our prior jurisprudence under Article I, Section 27 which, in the PUC's view, did not recognize an individual right of action to enforce this amendment, but, instead, vested in the legislature the exclusive right to balance environmental and social concerns in enacting laws, which process sufficiently ensured that the mandates of Article I, Section 27 were fulfilled.[41] In response, Citizens expressly aver that they are not presently challenging Section 3218.1 under Article I, Section 27, nor did they raise and preserve such a challenge in the proceedings below.

Our review of the certified record in this matter, and the parties' briefs, confirms Citizens' assertion that they have not

41. The Chamber of Commerce has filed an *amicus* brief in which it echoes the PUC's assertion that the Article I, Section 27 analysis articulated in Chief Justice Castille's plurality opinion is an unworkable standard, and it additionally claims that the plurality opinion is generating confusion for lower courts, administrative tribunals, and local governmental bodies, since it is being relied on by litigants and citizens, generally, in advancing arguments before those entities.

raised, preserved, nor do they presently advance a discrete challenge to the constitutionality of Section 3218.1 based on Article I, Section 27; thus, we need not consider the applicability of former Chief Justice Castille's plurality decision in this appeal.[42]

## B. Citizens' Appeal at 105 MAP 2014

1. **Whether Act 13's inclusion of Sections 3222.1(b)(10) and (b)(11) causes Act 13 to violate the single subject mandate of Article I, Section III of the Pennsylvania Constitution.**

■ We begin our discussion of Citizens' claims with their broadest challenge under the Pennsylvania Constitution, which is that Act 13 violates the "single subject rule" of Article III, Section 3 of that charter, because of its inclusion of Sections 3222.1(b)(10) and (b)(11).[43] Citizens argue that the inclusion of Sections 3222.1(b)(10) and (b)(11) in Act 13 renders the entire act violative of the clear mandates of Article III, Section 3, which specifies:

### § 3. Form of bills

No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

Pa. Const., art. III, § 3.

Citizens aver that Act 13, in its original form, dealt only with the regulation of the oil and gas industry, and that these

42. Citizens do refer to Chief Justice Castille's plurality opinion in footnote 3 of their brief, filed in 105 MAP 2014 ("Citizens' Second Brief") for the general proposition that the Commonwealth has a duty, as trustee of the public's natural resources, to treat public and private water suppliers equally in furtherance of this trust duty. However, in light of Citizens' express disavowal of any reliance on Article I, Section 27 in their challenge to Section 3218.1, and failure to preserve this claim in the proceedings below, we will not consider this argument.

43. The text of these sections is discussed at greater length in regards to Citizens' claim that they are special laws which were enacted in violation of Article III, Section 32 of our Constitution. See infra Part II.B.2.

provisions dealing with the duty of oil and gas operators to disclose chemicals used in the fracking process were inserted by a conference committee just prior to its final passage. Citizens argue these provisions go well beyond the regulation of the oil and gas industry, and, instead, are medical and public health regulations which change the way physicians and other public health professionals approach their legal and ethical obligations while performing their duties.

Citizens contend that the presence of these provisions renders Act 13 akin to the legislation we invalidated in City of Philadelphia v. Commonwealth, 575 Pa. 542, 838 A.2d 566, 585 (2003) (holding that multiplicity of disparate provisions of 127-page bill relating to diverse matters such as governance of the Philadelphia Convention Center, alteration of the statutorily mandated decisional process of a joint state and municipal authority, and changing the bond requirements for contractors performing municipal contracts could not be unified under the broad subject of "municipalities"), and Pennsylvania State Association of Jury Commissioners v. Commonwealth, 619 Pa. 369, 64 A.3d 611, 619 (2013) (finding legislation which allowed certain counties to abolish the office of jury commissioner, and created procedures for commissioners of counties of the third through eighth class to sell personal property and surplus farm products electronically, violated the single subject rule of Article III, Section 3 since these disparate provisions could not be unified under the broad subject of "powers of county commissioners").

The Attorney General responds by characterizing Sections 3222.1(b)(10) and (b)(11) as restrictions on the oil and gas industry, not restrictions on health care practitioners. The Attorney General observes that the purpose of these sections is to set reporting requirements for those in the oil and gas industry regarding the chemicals they use. Hence, the Attorney General argues such requirements are germane to the subject of the regulation of the oil and gas industry.

■ The law governing Article III, Section 3 claims is well settled: A bill will not violate the mandates of Article III,

Section 3, even though it pertains to multiple topics, provided that those topics are "germane" to a single subject. Commonwealth v. Neiman, 624 Pa. 53, 84 A.3d 603, 612 (2013); see also Leach v. Commonwealth, 636 Pa. 81, 141 A.3d 426 (2016). In accordance with the principle of deference to the General Assembly's constitutional prerogative to address complex matters in a single legislative enactment, our Court has deemed it appropriate, in addressing a single subject challenge, for a court to hypothesize a "reasonably broad topic" which would unify the various provisions of a final bill as enacted, provided such topic is not too expansive. Neiman, 84 A.3d at 612. In order to ascertain whether the hypothesized topic is sufficiently narrow, the various subjects contained within a legislative enactment must be examined to "determine whether they have a nexus to a common purpose." Id.

Presently, as discussed *supra*, the Commonwealth Court hypothesized the topic of Act 13 to be the "regulation of the oil and gas industry." Robinson III, 96 A.3d at 1119. Inasmuch as it considered the restrictions on disclosure of chemicals used in the fracking process established by Sections 3222.1(b)(10) and (11) germane to that objective, it upheld the provision as not violative of Article III, Section 3. This conclusion is in accord with our prior decisional law in this area. See generally Leach, 141 A.3d at 429–33 (summarizing our Court's jurisprudence regarding Article III, Section 3).

While, as detailed infra, Sections 3222.1(b)(10) and (b)(11) unquestionably impact physicians and other health professionals in carrying out the duties of their professions, the primary purpose of these sections does not appear to be the regulation of the health care professions. Rather, the primary purpose of these provisions, and the others contained within Section 3222.1, appears to be the maintenance of trade secret protections for the chemicals used in the fracking process by placing limits on disclosures of their identity by those in possession of such information. As a result, the Commonwealth Court's conclusion that Sections 3222.1(b)(10) and (11) were germane to Act 13's overall purpose of regulating the oil and gas industry is reasonable, and, thus, Act 13 is not unconstitutional

on this basis. We, therefore, affirm this portion of the Commonwealth Court order.

## 2. Whether Sections 3222.1(b)(10) and (b)(11) constitute a special law which violates Article III, Section 32.

Citizens next challenge Sections 3222.1(b)(10) and (b)(11) on the grounds that, together, they constitute a special law which violates Article I, Section 32 of the Pennsylvania Constitution, which provides:

### § 32. Certain local and special laws.

The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law:

1. Regulating the affairs of counties, cities, townships, wards, boroughs or school districts:

2. Vacating roads, town plats, streets or alleys:

3. Locating or changing county seats, erecting new counties or changing county lines:

4. Erecting new townships or boroughs, changing township lines, borough limits or school districts:

5. Remitting fines, penalties and forfeitures, or refunding moneys legally paid into the treasury:

6. Exempting property from taxation:

7. Regulating labor, trade, mining or manufacturing:

8. Creating corporations, or amending, renewing or extending the charters thereof.

Nor shall the General Assembly indirectly enact any special or local law by the partial repeal of a general law; but laws repealing local or special acts may be passed.

Pa. Const., art. III, § 32.

Sections 3222.1(b)(10) and (b)(11) impose restrictions on health professionals' access to information about chemicals used in the fracking process, which a vendor, service company or well operator claim to be trade secrets or confidential proprietary information. Specifically, they provide:

(10) A vendor, service company or operator shall identify the specific identity and amount of any chemicals claimed to be a trade secret or confidential proprietary information to any health professional who requests the information in writing if the health professional executes a confidentiality agreement and provides a written statement of need for the information indicating all of the following:

(i) The information is needed for the purpose of diagnosis or treatment of an individual.

(ii) The individual being diagnosed or treated may have been exposed to a hazardous chemical.

(iii) Knowledge of information will assist in the diagnosis or treatment of an individual.

(11) If a health professional determines that a medical emergency exists and the specific identity and amount of any chemicals claimed to be a trade secret or confidential proprietary information are necessary for emergency treatment, the vendor, service provider or operator shall immediately disclose the information to the health professional upon a verbal acknowledgment by the health professional that the information may not be used for purposes other than the health needs asserted and that the health professional shall maintain the information as confidential. The vendor, service provider or operator may request, and the health professional shall provide upon request, a written statement of need and a confidentiality agreement from the health professional as soon as circumstances permit, in conformance with regulations promulgated under this chapter.

58 Pa.C.S. § 3222.1(b)(10), (11).

Citizens first argue that the severe restrictions these statutory provisions place on physicians' access to, and ability to share, information regarding chemicals the natural gas industry deems to be trade secrets or confidential proprietary information, something it characterizes as a "physician gag rule," serve no legitimate state purpose, as they interfere with physicians' ability both to treat patients, and to contribute to

the development of public health knowledge. Citizens' Second Brief at 54. Citizens note that, for a physician to properly treat his or her patient, the physician must engage in a process known as "differential diagnosis" whereby the physician rules in or out various prospective causes of a patient's illness, and that this process requires the physician to consider, *inter alia*, the patient's occupational and environmental exposure to disease causing agents. Id. at 42. Citizens argue Sections 3222.1(b)(10) and (b)(11) interfere with this diagnostic process.

Citizens also propound that physicians are required by law to make written records of their diagnoses and findings with respect to the cause of a patient's illness or disease, Id. at 44 (citing 49 Pa. Code § 16.95). Although such recordation would include the identity of any chemical a physician determines is the source of the patient's illness, Citizens suggest the plain language of Sections 3222.1(b)(10) and (b)(11) would prevent the physician from recording such information. Citizens argue that, unlike other federal and state laws which require disclosure of industrial chemicals to medical professionals for purposes of treatment, while allowing for the protection of confidential or proprietary information, Sections 3222.1(b)(10) and (b)(11) contain no provisions which preserve the ability of physicians to meet their legal and ethical obligations to patients. Citizens claim that, as a result, these sections fundamentally interfere with physicians' ability to treat their patients, since, under their terms, even if physicians obtain information about a particular chemical to which a patient has been exposed, they are, nevertheless, prohibited from sharing that information with their patients.

Further, according to Citizens, these sections offer no guidance as to what may or may not be contained in the confidentiality agreements which physicians are required to execute. Moreover, other provisions of Act 13, such as Section 3274 (58 Pa.C.S. § 3274), which vests the Environmental Quality Board—an agency with no prior expertise regulating public health matters—with exclusive rulemaking authority over these agreements, are likewise silent on the permissible pa-

rameters of such agreements. Citizens maintain that this uncertainty as to what physicians may legally disclose to their patients or other medical providers places the physician in the untenable position of having to risk liability for improper disclosure of the identity of a chemical to a patient or fellow health care provider. In this regard, Citizens reject the Commonwealth Court's interpretation of these sections as permitting physicians to share with other treatment providers trade secrets they regard as necessary to diagnosing and treating individuals. They point out there is nothing in the plain language of these sections that provides this type of exception, which they observe has been expressly provided for in other federal and state right-to-know laws.

Citizens additionally note that these sections bar access by physicians, epidemiologists, and toxicologists to trade secrets and proprietary information which can be used for conducting public health assessments and studies. They aver that this lack of access will have the deleterious effect of hindering the long-term development of health policies and protocols to quickly identify illness, which would protect natural gas industry workers and members of communities in which drilling occurs. Citizens argue that identifying the medical conditions caused by the effects of chemicals on the human body has been a historical part of the duties of all health professionals, and the recording and sharing of information among such professionals is a necessary part of the process of developing the body of public health knowledge, which they claim these sections now inhibit.

Citizens assert that the net effect of these provisions is to grant the gas industry preferential treatment under the law in the protection of its proprietary information and trade secrets which has not been afforded to any other industry. They claim that the Commonwealth has not offered any legitimate reasons to justify why the gas industry needs such special protections. Citizens observe that the Commonwealth has, in fact, admitted that the purpose of these sections was solely to "protect the economic interests of the oil and gas industry," and, thus, in their view, such special and preferential treatment contra-

venes Article III, Section 32. Citizens' Second Brief at 57 (citing Attorney General's Brief in Robinson II).

In response, the Attorney General, on behalf of the Commonwealth, first offers a global defense of the *entirety* of Act 13, but in a highly abbreviated argument. The Attorney General contends that the law, as a whole, does not constitute a special law since it establishes protections for landowners, and that it "furthers the economic and environmental interests of the Commonwealth rather than benefiting a single group or entity." Attorney General's Brief at 27. Regarding Appellants' specific contentions involving Sections 3222.1(b)(10) and (b)(11), the Attorney General offers a two-sentence argument, contending that "there is a rational basis for putting some limitations on the dissemination of trade secrets in the oil and gas industry," and that, because these restrictions "are uniform across the entire industry," they do not constitute a special law. Id. at 27–28.

 A challenge to the constitutionality of legislation under Article III, Section 32 is a question of law; hence, our standard of review is plenary and non-deferential. Pennsylvania Turnpike Commission, 899 A.2d at 1094. As a general matter, statutes which are duly enacted by the legislature enjoy a presumption of validity and will not be found unconstitutional unless they "clearly, palpably and plainly violates the constitution." Id. Where, as here, the legislature has codified legislative findings in support of the statutory framework it has enacted, we accord "due regard" to those findings in our interpretation and analysis of the statute or statutes under review. Harrisburg School District v. Zogby, 574 Pa. 121, 828 A.2d 1079, 1087 (2003).

As our Court has recognized, consideration of the historical circumstances surrounding the enactment of Article III, Section 32 is instructive, as they evidence its framers' intent to restrict legislative favoritism of particular industries or persons—practices which they considered to be harmful to the general welfare of our populace. Id. at 1088. By the late 1800's, our nation had endured significant economic and social up-

heavals caused by state defaults on debts incurred in providing direct economic assistance to particular privileged and well-connected industries, and, in the immediate aftermath of the Civil War, the railroad and other industries, fueled by wartime profits, gained considerable influence over the passage of legislation. Anthony Schutz, State Constitutional Restrictions on Special-Legislation as Structural Restraints, 49 Journal of Legislation 39, 45 (2013-2014). These factors contributed to a general popular revulsion across the country at special treatment being afforded certain corporations or individuals by state legislative bodies. Id. This sentiment, coupled with the widespread and deeply rooted belief of our nation's populace that government was obligated in its official actions to pursue ends which were beneficial to the common good, were the impetus for the enactment of state constitutional provisions to restrain state legislatures from granting special privileges or treatment to select industries, groups, or individuals which did not serve to promote the general welfare of the public. Id. at 45–46.

Pennsylvania was among those states in which popular clamor for reform of such legislative practices was widespread, resulting in the Constitutional Convention of 1872 and 1873, which was requested by an overwhelming majority of Pennsylvania voters in a statewide referendum. As a leading Pennsylvania constitutional historian, Professor Robert Woodside, recounted:

> In the seven years preceding the Constitutional Convention of 1873, 8755 local and special acts, and only 475 general laws, were passed. The extensive use of local and special acts, most of them conferring a direct benefit on an individual or corporation, constituted open invitations to bribery, log rolling and flagrant favoritism. It was a governmental development that demanded reform.

Robert E. Woodside, Pennsylvania Constitutional Law 576 (1985); see also, Gary E. French, Home Rule in Pennsylvania, 81 Dick. L. Rev. 265, 267 n.20 (1977) (observing that, during the period after the Civil War in Pennsylvania, "the General Assembly was so occupied with dispensing special favors that

there was little time left to deal with problems of state-wide concern." (citation omitted)). Article III, Section 32 was, thus, adopted by the 1872-73 Convention and approved by the electorate in order to bring a halt to these practices. See Zogby, 828 A.2d at 1088 ("[T]he underlying purpose of Section 32's prohibition on special legislation was not so much to prohibit the General Assembly from undertaking limited, remedial measures as part of a long-term strategy to fulfill its duties connected with the public interest, but to end the practice of favoritism.").

In the years since Article III, Section 32's inclusion in our organic charter of governance, our Court has come to view its fundamental purpose to be the same as that served by the Fourteenth Amendment to the United States Constitution, in that they both enshrine the common constitutional principle that "like persons in like circumstances should be treated similarly by the sovereign." Pennsylvania Turnpike Commission, 899 A.2d at 1094. Even so, Article III, Section 32 does not deprive the legislature of its power to make classifications, or to treat persons differently who have different needs, which derives from its general power to enact laws that affect the health, safety, and welfare of the people of the Commonwealth. Zogby, 828 A.2d at 1088.

As our Court elaborated in Robinson II, when reviewing a legislative enactment to determine if it violates Article III, Section 32:

> Our constitutionally mandated concerns are to ensure that the challenged legislation promotes a legitimate state interest, and that a classification is reasonable rather than arbitrary and rest[s] upon some ground of difference, which justifies the classification and has a fair and substantial relationship to the object of the legislation. A legislative classification must be based on real distinctions in the subjects classified and not on artificial or irrelevant ones used for the purpose of evading the constitutional prohibition. In its review, a court may hypothesize regarding the reasons why the General Assembly created the classifications.

Robinson II, 83 A.3d at 987 (internal citations and quotation marks omitted).[44] A classification will, therefore, not violate Article III, Section 32, if it is one based on "necessity ... springing from manifest peculiarities clearly distinguishing those of one class from each of the other classes and imperatively demanding legislation for each class separately that would be useless and detrimental to the others." Allegheny County v. Monzo, 509 Pa. 26, 500 A.2d 1096, 1105 (1985) (quoting Commonwealth v. Gumbert, 256 Pa. 531, 534, 100 A. 990 (1917)).

As a preliminary matter, we address Citizens' contention that the Commonwealth Court erred in its interpretation of the scope of disclosure permitted under Sections 3222.1(b)(10) and (b)(11) by health professionals of the identity and amount of chemicals used in the fracking process by a service provider, vendor, or operator who has claimed, under Section 3222.1(b)(3), that such chemicals are protected from public disclosure as a trade secret or confidential proprietary information. The Commonwealth Court determined that "there is no indication in the statute that such agreement precludes a physician from sharing the disclosed confidential and proprietary information with another physician ... or from including such information in a patient's medical records." Robinson III, 96 A.3d at 1117. The court, relying on language in Section 3222.1(b)(11), which obligates a health professional who receives confidential information in an emergency situation to "maintain the information as confidential," 58 Pa.C.S. § 3222.1(b)(11), concluded that physicians were not precluded, generally, from sharing such information with other physicians or including it in a patient's medical records. The court reasoned that, since physicians have a duty to maintain confidentiality of patient information and are required to keep patient medical records which are specifically protected as confidential information, such disclosures as part of that process would maintain the required confidentiality. Respectfully,

44. This portion of the Court's decision was joined by four Justices and, hence, is precedential.

we do not find the Commonwealth Court's interpretation to be persuasive.

Although courts should interpret statutes so as to avoid constitutional questions when possible, they cannot ignore the plain meaning of a statute to do so. Housing Authority of the County of Chester v. Pennsylvania State Civil Service Commission, 556 Pa. 621, 730 A.2d 935, 948 (1999). Quite simply, the plain text of Sections 3222.1(b)(10) and (b)(11), quoted above, is silent as to this issue, inasmuch as both subsections refer only to the conditions under which the identity of chemicals claimed to be trade secrets or proprietary information may be disclosed by a vendor, service provider, or well operator in the oil and gas industry *to the health professional.* Neither subsection provides any guidance to a health care professional who comes into possession of such information as to whether he or she may then permissibly disclose it to other health professionals as part of the treatment of a patient.

First, the conditions set forth in Section 3222.1(b)(11), by their terms, do not apply to all medical treatment situations; rather they apply only when a medical emergency exists. Therefore Section 3222.1(b)(11)'s provisions may not be relied on to interpret Section 3222.1(b)(10) as did the Commonwealth Court. Section 3222.1(b)(10) governs a health professional's right of access to confidential and proprietary information in the normal course of treatment of a patient in non-emergency situations. Under this section, a health professional, in order to gain access to this information, must execute a written confidentiality agreement, rules for which have yet to be written by the Environmental Quality Board, even though Section 3241 of Act 13 mandated that it promulgate such rules. Thus, even if a health professional obtains access to this information, because he or she, in the exercise of his or her professional judgment, has deemed it necessary to effectively treat a patient for a medical condition, the health professional does not know whether he or she will be able to further disclose that information to other health professionals until he or she receives and executes a confidentiality agreement draft-

ed by the vendor, service provider, or operator. Even then, the health professional may be restricted by that agreement from disclosing it further to other health professionals, or even directly to the patient being treated, since nothing in this statute prohibits the imposition of such restrictions. Section 3222.1(b)(10), facially then, does not permit the uninhibited disclosure of medical information between health professionals, or from health professionals to their patients, in non-emergency medical treatment situations as the Commonwealth Court found.

Even in medical emergency situations governed by Section 3222.1(b)(11), in order to obtain this confidential or proprietary information, health professionals must make a verbal assertion of specific "health needs" in order to obtain the information, a term which is not otherwise defined anywhere in Chapter 58. 58 Pa.C.S. § 3222.1(b)(11). The health professional is also obligated to pledge that he or she will not then use the information for other purposes. Id. Once again, this language provides no assurance to a health professional that he or she may permissibly disclose the information to other health professionals as part of the emergency medical treatment process, especially if there are unforeseen medical issues that arise in the treatment of a patient which are arguably outside of the scope of the original "health needs" articulated by the health professional at the time of the request.

Moreover, and in any event, the plain language of these statutory provisions permits disclosure of this information to health professionals in non-emergency situations only "for the purpose of diagnosis or treatment of an individual," Id. § 3222.1(b)(10), and in emergency situations only if disclosure is "necessary for emergency treatment." Id. § 3222.1(b)(11). Thus, Citizens' assertion that further disclosure and sharing of this information by health professionals for other legitimate public health purposes—such as epidemiological studies assessing what health effects, if any, are being experienced by workers in the natural gas industry, or by groups of individuals in a community who have been exposed to chemicals used in the fracking process—are prohibited by these statutes,

appears well founded. Additionally, as Judge McCullough cogently discerned in her dissenting opinion below, these narrow restrictions would also seemingly foreclose health professionals from disclosing to other health care professionals any clinical findings they make during the course of treating a patient who has been exposed to these chemicals, or from publishing such findings in medical journals, in order to facilitate the development of effective future treatment plans for such exposures. See Robinson III, 96 A.3d at 1126 (McCullough J. dissenting) (observing that these statutory provisions have "the effect of severely curtailing the medical community's ability to share and discuss solutions concerning chemical toxicity cases and symptomatic presentations that they may never have encountered.").

Our independent interpretation of the operation of these statutory provisions confirms Citizens' assertions regarding the sweeping breadth of the restrictions imposed by Sections 3222.1(b)(10) and (11) on health professionals' ability to obtain, utilize, or further disclose confidential or proprietary information regarding chemicals used by the oil and gas industry in the fracking process. In considering the question of whether these statutes violate Article III, Section 32, the salient constitutional inquiry is not whether these restrictions apply uniformly to the entire oil and gas industry, or to all health professionals, as a class, which was found by the Commonwealth Court, and presently endorsed in this appeal by the Attorney General. Rather, the pivotal consideration is whether these sections confer on the oil and gas industry, as a class, special treatment not afforded to any other class of industry, and whether this special treatment "rest[s] upon some ground of difference, which justifies the classification and has a fair and substantial relationship to the object of the legislation." Robinson II, 83 A.3d at 987; Pennsylvania Turnpike Commission, 899 A.2d at 1095.

Citizens' assertions that these restrictions are unique, which are not disputed by the Commonwealth, are accurate: it appears no other industry in the Commonwealth has been statutorily shielded in this manner by the imposition of strin-

gent limitations and conditions on the access to, and use by, health professionals of information pertaining to chemicals, substances, or materials used in its operations claimed to be trade secrets or confidential proprietary information. Thus, Sections 3222.1(b)(10) and (11) grant the oil and gas industry, as a class, special protections for its trade secrets and confidential proprietary information which is enjoyed by no other class of industry. Unquestionably, the legislature's interest in permitting "optimal development of oil and gas resources of this Commonwealth," codified in Section 3202(1), is a legitimate one, and, in furtherance of that reasonable state interest, the legislature may afford the oil and gas industry statutory protections for its trade secrets and confidential proprietary information. However, the Commonwealth has not identified any difference between the oil and gas industry and the myriad of other industries operating within our Commonwealth, many of which use chemicals in their manufacturing processes, which justify these heavy constraints on health professionals' access to, and ability to use or further disclose, this type of information while carrying out the vital responsibilities of their vocation, and we cannot reasonably hypothesize any such justification. In sum, then, we discern no manifest peculiarity of the oil and gas industry which warrants granting it the special treatment conferred by Sections 3222.1(b)(10) and (b)(11), and so we hold that these statutory provisions violate Article III, Section 32's prohibition against the enactment of special laws. Accordingly, we reverse the order of the Commonwealth Court on this issue, declare these provisions to be void, and enjoin them from further application and enforcement. Monzo, 500 A.2d at 1105.

### 3. Whether Section 3218.1 constitutes a special law which violates Article III, Section 32.

Next we consider Citizens' claim that Section 3218.1 is a special law because it requires the DEP, in the event of a spill of chemicals, waste, or other substances associated with the fracking process, to notify only public drinking water facilities that could be affected, but imposes no requirement

for that agency to notify owners of private wells which supply drinking water. Section 3218.1 states:

> Upon receiving notification of a spill, the [DEP] shall, after investigating the incident, notify any public drinking water facility that could be affected by the event that the event occurred. The notification shall contain a brief description of the event and any expected impact on water quality

58 Pa.C.S. § 3218.1.

In its decision, the Commonwealth Court concluded that Section 3218.1 was not a special law. The court observed that Act 13 furnishes no definition of what constitutes a "public drinking water facility," but apparently regarded it as consistent with the definition of "public water system" contained in the Safe Drinking Water Act,[45] which requires such a system to serve an average of 25 or more people daily for 60 or more days a year, and the definition of "public water supply agency" contained in the Water Rights Act,[46] which encompasses entities such as municipal authorities and corporations with the legal right to provide drinking water to the public within a given municipality. By reciting and referencing these definitions, the court implicitly relied on them in accepting Citizens' assertion that the term "public drinking water facility," as it is used in Section 3218.1, does not encompass private wells.[47]

The court next proceeded to determine whether Section 3218.1's disparate treatment of public and private sources of drinking water comports with Article III, Section 32, utilizing the criteria set forth in Robinson II: does the challenged legislation promote "a legitimate state interest," and do classi-

45. See 35 P.S. § 721.3 (defining a public water agency as "[a] system for the provision to the public of water for human consumption which has at least 15 service connections or regularly serves an average of at least 25 individuals daily at least 60 days out of the year").

46. See 32 P.S. § 631(b) (defining a public water supply system as "any corporation or any municipal or quasi-municipal corporation, district, or authority, now existing or hereafter incorporated under the laws of the Commonwealth of Pennsylvania and vested with the power, authority, right, or franchise to supply water to the public in all or part of any municipal or political subdivision of the Commonwealth of Pennsylvania.").

47. No party challenges this interpretation.

fications established therein have a "fair and substantial relationship to the object of the legislation[?]" Robinson II, 83 A.3d at 987. The court viewed Section 3218.1 as promoting "the Commonwealth's legitimate interest in protecting the public water supply by ensuring that any public drinking water facilities that could be affected by a spill or contamination are notified of the event and any expected impact on water quality." Robinson III, 96 A.3d at 1112. The court conceded that the bulk of drilling for oil and gas occurs in rural areas, that a greater number of residents from those areas get their water from wells and other private suppliers, and that such water is not routinely monitored or tested as is that furnished through public health systems; nevertheless, it found valid reasons for Section 3218.1's dissimilar notice requirements.

The court observed that private wells are not subject to regulation under the Safe Drinking Water Act, the Water Rights Act, or other DEP regulations. Further, the majority observed that the DEP does not keep track of the location of private wells, or private well owners, even though it acknowledged that Section 4(a) of the Water Well Drillers License Act [48] ("WWDLA") requires all licensed well drillers [49] to keep official records of the location of every private water well they drill, on forms prescribed by the Department of Conservation and Natural Resources ("DCNR").[50] Given what it perceived as the DEP's lack of knowledge of the location of private wells, the court reasoned it was unfeasible for that agency to warn private well owners in the event of a spill. This conclu-

**48.** See 32 P.S. § 645.10(a).

**49.** Under Section 4(b) of the WWDLA, all water well drillers must be licensed, except for farmers or other individuals seeking to drill on property they own or lease, and which is used by them as a farm or residence.

**50.** Although Section 4(a) of the WWDLA does not require these reports to be submitted to the DCNR by drillers, a separate provision thereof—Section 4(c)—requires drillers to file a "statement of intention to drill" with the DCNR, within 24 hours of signing a contract to drill a water well, informing the agency of the name and address of the well owner and the township and county where it will be located. See 32 P.S. § 645.10(c).

sion, coupled with the court's estimation that water supplies furnished by public facilities cannot be easily or quickly replaced because of the number of customers those facilities serve (unlike a private well with only a limited number of users), led the court to hold that Section 3218.1's warning requirements for only public drinking water facilities, but not private well owners, was reasonable and related to the legitimate state interest furthered by the statute.

Even so, the court went on, in sweeping aspirational commentary, to recognize a salutary value in warning owners of private water supplies of threats to those supplies from a spill:

[T]hough we dismiss Count IV of the petition for review, that does not mean that in the event of a spill that either the DEP or the drilling company should not or will not use its best efforts to notify the affected community, even though it is not required to do so. Just as there is no affirmative requirement to notify individuals of an oncoming flood or fire, public entities as of course notify those in the path of danger. Even though it is not required to do so, in the event of a spill, the DEP will, in all likelihood, canvas the areas to identify individuals served by private wells and notify them of the spill and aid them in getting alternative water supplies to protect the public which it is charged to protect. Likewise, drilling companies should make similar undertakings as good corporate citizens, not to mention that it is their actions that necessitate the warning.

Robinson III, 96 A.3d at 1114.

In challenging the Commonwealth Court's determination, Citizens argue that Section 3218.1 is the very type of special legislation which Article III, Section 32 was designed to prevent. They first maintain that its distinction between notification requirements in the event of a spill between the owners and operators of public and private sources of drinking water is not reasonably related to a legitimate state purpose. Citizens note that owners and operators of both such water sources have the same need to be made aware, in the event of a spill, of its potential impact on drinking water due to its potential to affect the health of those who use the affected

water supplies. Indeed, Citizens aver, owners of private wells who rely on them for drinking water have an even greater need for such notification since public water supplies are routinely and regularly tested, thereby making it likely that a spill would be detected even absent such notification, whereas private wells do not undergo such a regular testing regimen. Relying on official United States Census Bureau data, Citizens contend that over three million Pennsylvania residents, most of whom live in rural areas, are dependent on private wells for their drinking water and for agricultural purposes, and, because of the great amount of oil and gas drilling occurring in these areas, they could be affected by a spill of chemicals or other water contaminants. Citizens' Second Brief at 19. Yet, despite the need for this large number of Pennsylvania residents to be made aware of a spill so that they may take action to mitigate the spill's effect on their drinking water and health, they are expressly excluded by this legislation from the category of individuals the DEP must notify in the event of a spill. Indeed, according to Citizens, private well owners may never receive notice of the existence of a spill until their water supply has been adversely affected, even though oil and gas well operators must "restore or replace" water supplies to a nearby well owner, who draws from the same aquifer and has been adversely affected. 58 Pa.C.S. § 3218. Citizens claim that, in such circumstances, the DEP does not issue a public notice of violation against the well operator, nor a formal determination that contamination has occurred, and this lack of warning exposes the users of an affected well, who are unaware of its condition, to the significant risk that they would use the contaminated water.

Citizens maintain that there are no qualities or concerns unique to the public water supply justifying such disparate treatment. Citizens concede that, while there is a legitimate interest in protecting public water supplies through imposing a notice requirement, there is no legitimate interest in excluding similar notice to owners of private water sources.

Citizens dismiss as unpersuasive the Commonwealth Court's rationale that this disparate classification is justified because

private drinking wells are not regulated by the Safe Drinking Water Act and the Water Rights Act. Citizens assert that Act 13 *does* attempt to regulate private water supplies by addressing and attempting to rectify hazards to private water supplies caused by oil and gas activities since Section 3218(a) imposes a duty on all operators of oil and gas wells to remediate any degradation of water quality or volume to *both* public and private sources of drinking water they have caused through their activities. Yet, Citizens contend, because of its disparate notice requirements, Section 3218.1 incongruously does not extend the equivalent safeguards to owners and operators of private water supplies.

Citizens also reject the Commonwealth Court's justification for the distinction based on the alleged difficulty the DEP would have in locating affected well owners. Citizens highlight that Section 3218.1's obligation to warn extends only to those water supplies within the vicinity that "could be affected," 58 Pa.C.S. § 3218.1; thus, the obligation to warn extends to a finite, ascertainable number of well owners. Citizens submit that the DEP could readily locate the affected residents since well drillers are required under Section 3211 of Act 13 to list on a permit application filed with the DEP the name of a surface landowner whose water supply is within 1,000 feet of a proposed conventional well location or, for an unconventional well, within 3,000 feet of the vertical well bore. 58 Pa.C.S. § 3211. Indeed, according to Citizens, the Commonwealth Court acknowledged the feasibility of finding private well owners by describing a hypothetical canvassing process the DEP would engage in after a spill. See Robinson III, 96 A.3d at 1114.

Citizens argue that, rather than serving a legitimate state purpose, this distinction in notification requirements was made to benefit the narrow interests of the oil and gas industry. Citizens aver that not requiring notification of owners of private wells minimizes the likelihood that the owners of the affected wells will demand the remediation required by Section 3218 and request additional testing of water supplies to ensure their safety, both of which would be costly to the

industry. Thus, Citizens reason, the apparent intent of this statutory provision was to lessen the potential financial impact to the oil and gas industry and, consequently, evidences favoritism to a particular industry at the potential expense of the health and welfare of the millions of citizens who obtain their water from private sources. Therefore, Citizens request that our Court reverse the Commonwealth Court, and find Section 3218.1 to be violative of Article III, Section 32.

In response, the DEP denies that Section 3218.1 constitutes a special law, and, in support thereof, adopts the Commonwealth Court's conclusion that the notification requirements of Section 3218.1 seek to promote the legitimate state interest of "protecting the public water supply." DEP's Brief at 15 (quoting Robinson III, 96 A.3d at 1112). The DEP proffers that there exist "real distinctions between public drinking water facilities and private drinking water wells," as reflected by the differing treatment of both under the myriad statutes which the agency enforces, which justify the classification found in Section 3218.1. Id. at 19.

First, the DEP stresses that it has never regulated private drinking wells, as it is not authorized to do so under state law. The DEP highlights that, as the Commonwealth Court found, neither the Pennsylvania Safe Drinking Water Act, nor the Water Rights Act, regulate such wells. The DEP also notes that other statutes which contain reporting requirements from operators of private wells to the DEP, such as the Water Resources Planning Act,[51] similarly make distinctions between private and public water sources by requiring only those private operators who meet certain threshold volume requirements to make reports to the DEP, while uniformly mandating that public agencies report all withdrawals. The DEP points out that other statutes, such as the Well Water Drillers Act, do not uniformly require reporting of the location of wells drilled by a property owner for his or her own use, or those drilled by a farmer. The DEP likewise points out that it is not required by other environmental laws such as the Clean

51. 35 P.S. §§ 721.1-721.17.

Streams Law [52] or the Storage Tank and Spill Prevention Act [53] to provide notice to private well owners, but rather, those laws impose such notification requirements on those responsible for the spill.

The DEP claims that Section 3218, cited by Citizens, does not establish a new regulatory regime for private water supplies since this provision does not regulate the construction or oversight of private water wells as do other statutes which apply to public water systems. While the DEP acknowledges that this section places on well operators a duty to protect waters in the Commonwealth by restoring or replacing such waters if they are harmed by activities connected to the drilling and operation of an oil and gas well, it, nevertheless, summarily rejects the contention that this establishes any sort of regulatory relationship between it and the well operators.

The DEP further maintains that Section 3218.1's notice distinction between private and public water suppliers is justified by the fact that public drinking water supplies serve a greater number of residents than do private wells; hence, a spill that impacts sources of public drinking water would negatively impact a larger number of people than would a spill which affects a private well. According to the DEP, it would be more difficult to provide replacement sources of water to the customers of a public water supplier, because of the sheer number of affected individuals; thus, expedited notice is crucial to avoid this consequence.

The DEP also argues that it does not have a reliable inventory of the locations or owners of private wells because of the lack of reporting requirements for well drillers regarding agricultural wells, or those drilled by a landowner, which are only provided upon the request of the DEP. The DEP acknowledges the permitting requirements of Section 3211(b), but it avers that this information is of diminished value with respect to the notification requirements of Section 3218.1, inasmuch as the latter section requires notification no matter

52. 35 P.S. §§ 691.1 *et. seq.*
53. 35 P.S. §§ 6021.101 *et. seq.*

where the spill takes place, which could be outside of these boundaries, and, hence, the DEP would have no information regarding the identity of well owners in such areas.

The DEP attests that it "administers a robust program designed to prevent and respond to spills associated with oil and gas activities." DEP's Brief at 33. The DEP outlines the required steps that existing environmental laws require a party responsible for a spill to take, which include notifying the DEP. Id. at 33–37. After the DEP is so notified by the responsible party, or through other means such as public reports, the DEP asserts it undertakes an evaluation of the spill and then, if it concludes that the spill may affect a private water supply, it "routinely provides notice to those persons potentially impacted," and conducts additional investigation, including testing, if warranted. Id. at 37. The DEP further points out that it requires remediation of areas affected by a spill or release at an oil or gas site. In the DEP's view, all of these factors demonstrate that it carries out its legal obligation to protect private water supplies and that Act 13 does not interfere with its ability to do so.

Our analysis of this Article III, Section 32 claim is, as the parties and the Commonwealth Court have recognized, governed by the standard articulated in Robinson II and our prior caselaw, discussed above, which requires consideration of whether "the challenged legislation promotes a legitimate state interest, and that a classification is reasonable rather than arbitrary and rests upon some ground of difference, which justifies the classification *and* has a fair and substantial relationship to the object of the legislation." Robinson II, 83 A.3d at 901 (emphasis added); Pennsylvania Turnpike Commission, 899 A.2d at 1095. Thus, in order for Section 3218.1 to withstand Citizens' challenge: (1) it must promote a legitimate state interest; (2) its disparate notification requirements for public water suppliers and private well owners must be reasonable and based upon some difference between these two classes of water users that justifies this dissimilar treatment, and (3) these contrasting notice requirements must have a fair and substantial relationship to the overall objectives the Gen-

eral Assembly's sought to achieve through its enactment of Act 13. The Commonwealth Court, in its opinion, and the DEP, in its arguments to our Court, have focused on the first two of these considerations.

Both proffer that notification to public water suppliers promotes a legitimate public interest—ensuring that customers of those suppliers have safe drinking water. We wholly agree with this proposition, as it is beyond cavil that those Commonwealth residents who rely on water supplies provided through their city, town or municipal governments, either directly or through a contract with a private supplier, have the right to expect that the water they drink or bathe in will not cause them deleterious health effects.

However, the Commonwealth Court ultimately rejected Citizens' claim on the basis of the DEP's arguments, which the DEP renews to our Court, that its claimed absence of any regulatory duty over private water wells, coupled with its alleged lack of a reliable body of knowledge about where such private water wells are situated in relation to oil and gas wells, provide reasonable justification for not requiring it to provide notice to private well owners in the event of a spill. Even assuming, *arguendo*, the truth of the DEP's assertions, which we accept are made by it in good faith, the existence of such alleged administrative burdens with respect to the notification of owners of private water supplies, in and of themselves, does not establish that Section 3218.1 comports with Article III, Section 32; rather, the circumscribed notice requirements of Section 3218.1 must also have a fair and substantial relationship to the legislative objectives of Act 13, a factor which we find the Commonwealth has not established.

Two of the express purposes of Act 13, as statutorily codified, are: to protect "the health, safety, environment and property of Pennsylvania citizens," and to "[p]rotect the safety and property rights of persons residing in areas where mining, exploration, development, storage or production occurs." 58 Pa.C.S. § 3202(1), (3). These provisions evidence the legislature's intent to have each of the provisions of Act 13 operate to secure the health, safety, and property rights for *all*

Pennsylvania residents during the oil and gas extraction process, without exception. Consequently, we do not conceive how Section 3218.1's exclusion of notice to over three million of our Commonwealth's residents who receive their drinking water from wells—roughly a quarter of our population [54]—that their health, or even their property, may be at risk as the result of a spill that has potentially jeopardized the safety of the water they consume, bears any fair and substantial relationship to this objective. The residents of the Commonwealth who receive their water from private wells depend on the safety of the water they draw from those wells to the very same extent as individuals who receive their water from public water facilities; yet, this vital safety interest is left wholly unprotected by Section 3218.1's exclusion of this large class of Commonwealth residents from receiving mandatory warnings of a serious public health danger posed by the potential contamination of their water. Their need for warning in such circumstances is no less than those who receive their water from public water facilities.

Further, as Citizens have highlighted, the legislature, through its inclusion of Section 3218 in Act 13, has additionally demonstrated its specific intent to provide private well owners the unqualified right to restoration or replacement of any water from their wells in the event it becomes polluted or depleted as the result of oil and gas operations. See 58 Pa.C.S. § 3218(a) ("[A] well operator who affects a public or private water supply by pollution or diminution shall restore or replace the affected supply with an alternate source of water adequate in quantity or quality for the purposes served by the supply."). Once more, we fail to see how this clear legislative purpose is fulfilled by the exclusion of private well owners

54. See Bryan R. Swistock, "Drinking Water Quality in Rural Pennsylvania and the Effect of Management Practices," The Center for Rural Pennsylvania (January 2009), at 5 (estimating, based on the last available United States Census Department data, that over three million Pennsylvania residents get their drinking water from private wells); www.census.gov (estimating population of Pennsylvania in 2015 at 12,802,503). (The Center for Rural Pennsylvania is a bipartisan, bicameral legislative agency that serves as a resource for rural policy within the Pennsylvania General Assembly.).

from receiving notice of a spill. Such notice is an integral predicate to private well owners requesting, and ultimately obtaining, the remedial relief guaranteed to them by this statute, as, absent such notice, they are unlikely to become independently aware of any damage done to their well water from a spill, given that such harm is often not visibly apparent and can only be definitively ascertained through specific testing for such contaminants. As the Commonwealth Court acknowledged, such testing is not routinely undertaken for private water supplies.

Additionally, as Citizens have highlighted, there is no other mandate for the DEP to provide such notice, nor are oil and gas well operators required to give such notice, to private well owners once a spill occurs. Indeed, information the DEP comes into possession of regarding the identity of spilled chemicals used in the fracking process, which are claimed to be trade secrets or confidential or proprietary information, is specifically *exempted* from being generally accessible as a public record. Id. § 3222.1(d). In short, Section 3218.1's exclusion of mandatory notice by the DEP to these well owners does not further the legislative goal of ensuring they may exercise their right to have the integrity of their water supply secured in the event it is threatened by pollution from a spill; to the contrary, this exclusion serves to undermine that goal. For these reasons, we conclude that Section 3218.1's requirement that only public water facilities must be informed in the event of a spill is unsupportable under Article III, Section 32 of our Constitution.

Having made this determination, we must necessarily consider the appropriate remedy. Citizens argue that our Court should "enter an order striking from Section 3218.1 the unconstitutional classification that provides notice of a spill only to public water facilities." Citizens' Brief at 35. We decline to do so, as such a course of action is unfeasible, given that there is no language which can be stricken from this section, as it is currently written, which could rectify its unequal treatment of private well owners and public water suppliers. To the contrary, our Court would have to *add* language to the statute

extending its notification requirements to private well owners in order to achieve this result. It is not our Court's role under our tripartite system of governance to rewrite a statute once we have fulfilled our constitutional duty of judicial review; that is a function reserved to the policymaking branch. Heller, 475 A.2d at 1296 ("Where a legislative scheme is determined to have run afoul of constitutional mandate, it is not the role of this Court to design an alternative scheme which may pass constitutional muster."); accord Hopkins, 117 A.3d at 262 (refusing to "judicially usurp the legislative function" by re-writing a criminal statute after portions of that statute, which were not severable, were stricken as violative of the Sixth Amendment). We are, therefore, obligated to strike Section 3218.1 in its entirety and enjoin its further application and enforcement, and, accordingly, we reverse the Commonwealth Court's order in this regard.

Nevertheless, we are sensitive to the DEP's concern that, as a practical matter, the striking of this statute, in its entirety, will mean that it no longer has a formal statutory obligation to provide notice to a public water supplier in the event of a spill. Given the significant public health ramifications of striking this mandate, we will stay our mandate as to this section for 180 days in order to allow the General Assembly sufficient time to devise a legislative solution. Neiman; PAGE. Thus, the DEP must continue to provide notice, as before, to public water suppliers during the pendency of this stay.

4. **Whether Section 3241 is unconstitutional because it confers power on a private corporation to take private property in violation of the Fifth Amendment of the United States Constitution and Article I, Sections 1 and 10 of the Pennsylvania Constitution.**

Finally, we consider Citizens' claim that Act 13 allows a taking of private property by a private corporation in violation of the Pennsylvania and United States Constitutions. The relevant portion of Section 3241 which authorizes the taking of real property for the storage of natural or manufactured gas specifies:

## § 3241. Appropriation of interest in real property

(a) **General rule.**—Except as provided in this subsection, a corporation empowered to transport, sell or store natural gas or manufactured gas[55] in this Commonwealth may appropriate an interest in real property located in a storage reservoir or reservoir protective area for injection, storage and removal from storage of natural gas or manufactured gas in a stratum which is or previously has been commercially productive of natural gas. The right granted by this subsection shall not be exercised to acquire any of the following for the purpose of gas storage:

(1) An interest in a geological stratum within the area of a proposed storage reservoir or reservoir protective area:

(i) unless the original recoverable oil or gas reserves in the proposed storage reservoir have been depleted or exhausted by at least 80%; and

(ii) until the condemnor has acquired the right, by grant, lease or other agreement, to store gas in the geological stratum underlying at least 75% of the area of the proposed storage reservoir.

(2) An interest in a geological stratum within the area of a proposed storage reservoir or reservoir protective area owned directly or indirectly by a gas company or other person engaged in local distribution of natural gas, if the interest to be acquired is presently being used by the gas company or other person for storage of gas in performance of service to customers in its service area.

58 Pa.C.S. § 3241(a).

In ruling on Citizens' claim that Section 3241 violates the Fifth Amendment to the United States Constitution and Article I, Section 10 of the Pennsylvania Constitution[56] by permit-

---

**55.** Manufactured gas, which is not specifically defined by Act 13, is generally defined to be "a combustible gaseous mixture (as carbureted water gas or producer gas) made from coal, coke, or petroleum products for use as a fuel, illuminant, or raw material for synthesis." Webster's Dictionary (2016), http://www.merriam-webster.com/dictionary/manufactured% 20gas.

**56.** Both constitutional provisions prohibit the taking of private property for "public use," "without just compensation." U.S. Const., amend. V;

ting a private corporation to appropriate a landowner's interest in real property for storage of natural or manufactured gas, the Commonwealth Court reasoned that this section grants this power only to a corporation that is "empowered to transport, sell or store natural gas in this Commonwealth." Robinson III, 96 A.3d at 1114 (quoting 58 Pa.C.S. § 3241(a)). The court observed that this definition is consistent with the definition of "public utility" as set forth in Section 102 of the Public Utility Code,[57] and the definition of a "public utility" as defined by the BCL,[58] as well as relevant PUC regulations. The court also, without elaboration, referenced Section 1102(a)(1)(i) of the Public Utility Code, which allows a public utility to obtain a certificate of public convenience from the PUC. Viewing these statutory provisions *in toto*, the court reasoned that Section 3241 confers the power of eminent domain only on corporations which are public utilities possessing a certificate of convenience, and, hence, are statutorily authorized to exercise such power;[59] thus, the court concluded that Section 3241 does not violate the federal and state constitutional prohibitions against government-authorized taking of private property for the benefit of a private party.

Citizens argue that the Commonwealth Court erred in concluding that Section 3241 confers the powers of eminent domain only on corporations which are public utilities and which have obtained a certificate of convenience, inasmuch as its language appears to apply to certain non-public utility

Pa. Const., art. I, § 10. Article I Section 10 of our Constitution also explicitly forbids such taking unless done under "authority of law." As neither party in this matter has argued that Article I, Section 10 provides greater protections against unlawful takings we assume these provisions are coextensive for purposes of our analysis.

**57.** 66 Pa.C.S. § 102.

**58.** The BCL classifies a domestic or foreign corporation as a public utility if it (1) is subject to regulation as a public utility by the PUC or an officer or agency of the United States; or (2) was subject to such regulation on December 31, 1980, or would have been so subject if it had been then existing. 15 Pa.C.S. § 1103.

**59.** See 15 Pa.C.S. § 1511(a)(3) (authorizing a public utility corporation to exercise the power of eminent domain to take property for "[t]he production, generation, manufacture, transmission, storage, distribution or furnishing of natural or artificial gas ... to or for the public.").

corporations as well. Citizens highlight the fact that Section 102 of the Public Utility Code provides that the definition of public utility "does not include: ... [a]ny producer of natural gas not engaged in distributing such gas directly to the public for compensation." 66 Pa.C.S. § 102(2)(iii). Citizens additionally note that, in order for a company or entity to achieve the legal status of public utility, the Public Utility Code requires the company or entity to demonstrate to the PUC, via an application and review process, why they are qualified to receive that designation, as it is not automatically conferred. Citizens observe that, under the Commonwealth Court's interpretation, some natural gas companies, which do not meet the statutory criteria for classification as a public utility, or which elect not to seek a public certificate of convenience because they do not want to be subject to regulations governing public utilities, are, nevertheless, seemingly authorized by the language of Section 3241 to condemn private property in order to store natural gas purely for their own benefit.

Citizens contend that conferring such broad powers on private corporations violates the constitutional prohibitions against such takings contained within the Fifth Amendment to the United States Constitution and Article I, Section 10 of the Pennsylvania Constitution.[60] Citizens aver that the United State Supreme Court in Kelo v. City of New London, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), reaffirmed that the Fifth Amendment bars a taking of private property for purely private purposes, as it violates the public use requirement of that Amendment, and that our Court, in the case of In

60. Citizens raised in the Commonwealth Court an additional issue of whether Section 3241 violated 26 Pa.C.S. § 204(a) (statutorily prohibiting the use of the power of eminent domain by private businesses except in limited enumerated circumstances). However, before our Court, Citizens did not preserve a discrete claim based on Section 204(a) in their statement of the questions involved in their brief, nor pursue it in their argument; hence, we deem the question of the applicability of Section 204(a) waived for purposes of this appeal. See Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."); Wirth v. Commonwealth, 626 Pa. 124, 95 A.3d 822 (2014) (failure to develop argument in brief constitutes waiver of issue for our Court's review).

re Opening Private Road for Benefit of O'Reilly, 607 Pa. 280, 5 A.3d 246 (2010), stressed that, in order for a taking to be considered a public purpose under both the state and federal constitutions, the public must be the "primary and paramount beneficiary of the taking." Id. at 258. The mere conferral of an indirect or incidental benefit to the public is insufficient to constitutionally justify such a taking of private property. Id.

The Attorney General defends Section 3241 by endorsing the Commonwealth Court's interpretation that it authorizes only public utilities to condemn a property owner's land for storage of natural gas. The Attorney General argues that Sections 102 and 1101 [61] of the Public Utility Code establish that the only corporate entities which are permitted by those statutory provisions to "transport, sell or store natural gas or manufactured gas" are public utilities. The Attorney General additionally proffers that, even if a corporation does not directly supply oil or natural gas to consumers as required by Section 102 of the Public Utility Code, its authority to seize property would serve a public purpose by allowing the "establishment of an infrastructure to facilitate the development of oil and gas resources in Pennsylvania," which the Attorney General claims would benefit the public. Attorney General's Brief at 25. [62]

The PUC also argues in defense of the Commonwealth Court decision. The PUC echoes the Commonwealth Court's and the Attorney General's interpretation of the relevant

**61.** Section 1101 provides:

Upon the application of any proposed public utility and the approval of such application by the commission evidenced by its certificate of public convenience first had and obtained, it shall be lawful for any such proposed public utility to begin to offer, render, furnish, or supply service within this Commonwealth. The commission's certificate of public convenience granted under the authority of this section shall include a description of the nature of the service and of the territory in which it may be offered, rendered, furnished or supplied. 66 Pa.C.S. § 1101.

**62.** The Attorney General also asserts that a facial challenge to Section 3241 is premature and that resolution of this question would have to await a situation where a non-public utility attempts to seize property; whereupon a challenge to that taking could be lodged. As discussed supra, in Robinson II, we expressly rejected a similar argument.

statutes as conferring the power of eminent domain only on oil and gas companies which are public utilities and have obtained a certificate of convenience. The PUC also suggests, however, that this power would similarly extend to other entities so long as they are "certified and regulated ... [and] possessing all necessary permits." PUC's Brief at 23. The PUC argues that, even if Section 3241 is susceptible to a broader interpretation encompassing corporations other than public utilities, our Court would be constrained to reject it, since the canons of statutory construction require us to presume that the legislature does not intend to violate the constitution, 1 Pa.C.S. § 1922(3), and that the public interest is favored over any private interest, Id. § 1922(5).

As our Court has described, the power of eminent domain is an inherent one possessed by the Commonwealth, as sovereign, which permits it to take private property for a public use if the landowner receives just compensation for the taking. Reading Area Water Authority v. Schuylkill Greenway Association, 627 Pa. 357, 100 A.3d 572, 578 (2014). Although the Commonwealth may choose to delegate such power to other entities, the Commonwealth's power of delegation is not plenary, as it is restrained by our federal and state Constitutions, and may be further limited by statute. Id. at 579. The primary federal and state constitutional limitation imposed on the exercise of this power by the Commonwealth, or by any entity to which the Commonwealth has delegated such power, is that private property may only be taken to serve a public purpose. O'Reilly, 5 A.3d at 258; Philadelphia Clay Co. v. York Clay Co., 241 Pa. 305, 88 A. 487, 488 (1913) ("[T]he power of the Legislature to invest individuals or corporations with the right of eminent domain has its limitations, the most important of which is that the property taken must be for a public use."). In order to satisfy this public purpose requirement, "the public must be the primary and paramount beneficiary of the taking." O'Reilly, 5 A.3d at 258. A mere incidental benefit to the public from the taking is insufficient to render it lawful under both the United States and Pennsylvania Constitutions. Id. Further, because the exercise of eminent domain power is

in derogation of private property rights, any statute that authorizes its use will be strictly construed in favor of landowners. Reading Area Water Authority, 100 A.3d at 578.

In considering whether Section 3241 is a lawful delegation of the Commonwealth's power of eminent domain, we must necessarily examine its terms, and we do so in accordance with the principle that we give those terms their ordinary and plain meaning. 1 Pa.C.S. § 1921(a); Penn Jersey Advance v. Grim, 599 Pa. 534, 962 A.2d 632, 636 (2009). The plain language of Section 3241(a) permits "a corporation empowered to transport, sell or store natural gas or manufactured gas in this Commonwealth" to use the subsurface real property of another landowner in order to store natural or manufactured gas. 58 Pa.C.S. § 3241. This type of forced use of another landowner's property unquestionably deprives that landowner of the use and enjoyment of the subterranean portion of his property, given that natural gas is now physically occupying it; hence, it constitutes a *de facto* taking by the corporation. McElwee v. SEPTA, 596 Pa. 654, 948 A.2d 762, 765, n. 2 (2008) (a *de facto* taking "occurs when the entity clothed with the power of eminent domain substantially deprives an owner of the use and enjoyment of his property").

The Commonwealth Court and Appellees strive mightily to read the language of Section 3241(a) as restricting this taking power to only those corporations which qualify, statutorily, to be public utilities. Ostensibly they do so to establish that the conferral of this power should then be considered beyond constitutional challenge, because public utilities have long been permitted the right to exercise powers of eminent domain conferred on them by the Commonwealth in furtherance of the overall public good. See Appeal of Independence Township School District, 412 Pa. 302, 194 A.2d 437, 440 (1963) ("The conferring upon a corporation by the state of the power of eminent domain is an official recognition of the fact that the corporation receiving this grant of power is engaged in a business so vital to the public welfare that it is really engaged in the administration of a public trust, and therefore it is entitled to the classification of a quasi public corporation.").

However, the text of Section 3241(a) simply does not allow for such a narrow reading. It allows *any* corporation "empowered to transport, sell, or store natural gas or manufactured gas in this Commonwealth" to exercise the power of eminent domain over the private lands of another. As developed by Citizens, under the Public Utility Code, those activities involving natural gas do not, alone, qualify a corporation to be considered a public utility; rather, the Code specifies that only corporations "owning or operating in this Commonwealth equipment or facilities for: [p]roducing, generating, transmitting, distributing or furnishing natural ... gas ... for the production of light, heat, or power *to or for the public for compensation*; ... [t]ransporting or conveying natural ... gas ... by pipeline or conduit, *for the public for compensation*" qualify for classification as a public utility. 66 Pa.C.S. § 102(1)(i); (v) (emphasis added). Further, the legislature has specifically directed that those producers of natural gas which do not sell gas "directly to the public for compensation" are excluded from classification as public utilities. 66 Pa.C.S. § 102(2)(iii). Critically, then, Section 3241(a), by its terms, does not restrict the type of corporation eligible to take the subterranean lands of another property owner to only corporations that meet these specific legislatively imposed conditions for them to qualify for classification as public utilities.[63]

Consequently, Section 3241(a), facially, confers a broad power on private corporations to take private property of other landowners to store natural gas therein. Indeed, the breadth of the scope of this power is underscored by the fact that Section 3241(a) places only two limited types of property outside of its reach: (1) property which still has more than 20 percent of its recoverable oil and gas reserves, and (2) subsurface areas already owned by other gas companies, or persons engaged in the distribution of natural gas, if those areas are presently being used by those companies for storing gas as

---

**63.** The Commonwealth Court's reference to the BCL's definition of public utilities is unavailing for this reason as well, because private corporations attain the status of a public utility under that law only if they are "subject to regulation as a public utility by the Pennsylvania Public Utility Commission." 15 Pa.C.S. § 1103.

part of providing service to customers. 58 Pa.C.S. § 3241(a)(1), (2). The Commonwealth does not claim, nor can it do so reasonably, that the public is the "primary and paramount" beneficiary when private property is taken in this manner. Instead, it advances the proposition that allowing such takings would somehow advance the development of infrastructure in the Commonwealth. Such a projected benefit is speculative, and, in any event, would be merely an incidental one and not the primary purpose for allowing these type of takings. We therefore conclude that Section 3241(a) is repugnant to both the Fifth Amendment to the United States Constitution and Article I, Section 10 of the Pennsylvania Constitution, and we enjoin it from further application and enforcement. Correspondingly, we reverse the portion of the Commonwealth Court's order upholding its validity.

## III. Conclusion.

For the foregoing reasons, we affirm the Commonwealth Court's order in part, and we reverse it in part, as follows:

A. Sections 3305-3309 of Act 13 are not severable from Sections 3304 and Sections 3303 of Act 13, which our Court held unconstitutional in Robinson II, nor severable from Section 3302 of Act 13, as modified by the Commonwealth Court below in Robinson III, through its striking of the last sentence of that section. Accordingly, application and enforcement of Sections 3305 through 3309 are hereby enjoined. The Commonwealth Court's order is affirmed with respect to this question.

B. Act 13 does not violate the single subject rule of Article III, Section 3 of the Pennsylvania Constitution with its inclusion of Sections 3222.1(b)(10) and 3222.1(b)(11), since those provisions are germane to the overall subject of Act 13, regulation of the oil and gas industry in Pennsylvania. The order of the Commonwealth Court is affirmed with respect to this question.

C. Sections 3222.1(b)(10) and 3222.1(b)(11) of Act 13 which limit health professionals' access to, and use of, information regarding chemicals used in the hydraulic fracturing pro-

cess, which has been designated confidential and proprietary information or trade secrets by a vendor, service provider, or well operator, violate the prohibitions in Article III, Section 32 of the Pennsylvania Constitution against the enactment of "special laws," and, hence, application and enforcement of those sections are hereby enjoined. The order of the Commonwealth Court is reversed in relevant part.

D. Section 3218.1 of Act 13, which requires notice by the DEP in the event of a spill of chemicals or waste associated with the fracking process to public water facilities, but not to owners of private wells, violates the prohibition in Article III, Section 32 of the Pennsylvania Constitution against the enactment of "special laws," and, hence, application and enforcement of this section are hereby enjoined. The order of the Commonwealth Court is reversed in relevant part. This portion of our Court's mandate is stayed for 180 days to allow the General Assembly time to craft remedial legislation.

E. Section 3241 of Act 13, which facially permits any private corporation empowered to transport, sell, or store natural gas or manufactured gas in Pennsylvania to seize subsurface lands of a private property owner for the purpose of storing natural gas therein, violates the Fifth Amendment to the United States Constitution and Article I, Section 10 of the Pennsylvania Constitution by permitting a taking of private property for a private purpose. Consequently, application and enforcement of this section are hereby enjoined. The order of the Commonwealth Court is reversed in relevant part.

Jurisdiction is relinquished.

Former Justice Eakin did not participate in the consideration or decision of this case.

Justices Donohue, Dougherty and Wecht join the opinion.

Chief Justice Saylor files a concurring and dissenting opinion.

Justice Baer files a concurring and dissenting opinion.

CHIEF JUSTICE SAYLOR, concurring and dissenting

I took a different view of this case in connection with the Court's previous review. I expressed the belief that those with standing to challenge Act 13's validity should have been required to adduce *evidence* supporting their contentions, to be tested through the adversarial process, before any of the law should be stricken. *See Robinson Twp. v. Commonwealth*, 623 Pa. 564, 741–50, 83 A.3d 901, 1009–14 (2013) (Saylor, J., dissenting); *accord* Joshua P. Fershee, *Facts, Fiction, and Perception in Hydraulic Fracturing: Illuminating Act 13 and Robinson Township v. Commonwealth of Pennsylvania*, 116 W. VA. L. REV. 819, 826 (2014) (focusing on "how assumed facts were used to justify the plurality opinion" in the 2013 *Robinson Township* opinion). I also did not support the conferral of standing upon municipalities—which are otherwise creatures of the Legislature—to invoke the rights of "the people," under Article I, Section 27 of the Pennsylvania Constitution, PA. CONST., art. I, § 27, and thereby to challenge a presumptively valid legislative enactment. To the extent that the majority credits plurality aspects of the previous *Robinson Township* decision related to such matters, *see, e.g.*, Majority Opinion, at 277 n. 35, 147 A.3d at 559 n. 35, I am unable to join the opinion.

With respect to the severability of Sections 3305 to 3309, I agree with the position advanced by the Public Utility Commission and credited by Judge Brobson in his dissenting opinion on the Commonwealth Court. *See Robinson Twp. v. Commonwealth*, 96 A.3d 1104, 1123–24 (Pa.Cmwlth.2014) (Brobson, J., dissenting); *cf. id.* at 1126 (McCullough, J., concurring and dissenting). Applying the presumption in favor of severability and the "jurisprudential restraint" required of reviewing courts, *Stilp v. Commonwealth*, 588 Pa. 539, 627, 905 A.2d 918, 971 (2006), it is my position that the statutory framework and conditions for local government to be eligible to receive impact fees should be left intact, to the degree that

they were not found to be unconstitutional and enjoined by the 2013 *Robinson Township* decision. In this regard, I respectfully differ with the majority's depiction of the role ascribed by the General Assembly to the Public Utility Commission and/or the Commonwealth Court as that of a "statewide zoning hearing board," Majority Opinion, at 287–88, 147 A.3d at 565-66. *See* Brief for the PUC at 16 (explaining that Act 13 "leaves the procedures of the MPC intact; it merely adds an additional procedure that is necessary because the MPC does not specifically address the impact fees unique to Act 13").

I also would not invalidate, on the basis that it comprises special legislation, the provision of Act 13 requiring the Department of Environmental Protection to notify public drinking water facilities of spills. *See* 58 Pa.C.S. § 3218.1. From my point of view, the protection of public water sources is a legitimate and important state purpose fully justifying the enhanced notice requirement fashioned by the Legislature. *See generally Appolo Fuels, Inc. v. U.S.*, 381 F.3d 1338, 1350–51 (Fed.Cir.2004) (identifying protection of a public water supply as important government action designed to protect the health and safety of communities). Furthermore, I do not view the prohibition against special legislation as requiring the General Assembly to expand the scope of an administrative agency's regulatory purview before the agency can be directed to accomplish a publicly-oriented task relative to public water sources. Moreover, as the Department discusses at length, there are other statutory protections serving the interests of those maintaining private water sources. *See, e.g.*, Brief for DEP at 32 (explaining that the claim that Section 3218.1 "relieves ... industry from having to address its true impact on rural communities misleadingly omits any reference to the laws and policies that form the basis of DEP's comprehensive spill prevention and response program").

In all other respects, I concur in the result attained under the majority opinion.

JUSTICE BAER, concurring and dissenting

I join the third paragraph of Chief Justice Saylor's concurring and dissenting opinion, concluding that Section 3218.1 of

328

Act 13, 58 Pa.C.S. § 3218.1 (requiring the Department of Environmental Protection to notify any public drinking water facility of a spill), does not constitute a special law in violation of Article III, Section 32 of the Pennsylvania Constitution.

In all other respects, I concur in the result of the Majority Opinion.